AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Central District of California

LODGED
CLERK, U.S. DISTRICT COURT
5/27/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ tam ___ DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
5/27/22
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ D.C. ___ DEPUTY

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. |
| | ) | |
| Anthony Cervantes | ) | 5:22-mj-00345 |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____May 27, 2022____ in the county of ____San Bernardino____ in the ____Central____ District of ____California____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1); 846 | Distribution and possession with the intent to distribute controlled substances.  Conspiracy to distribute controlled substances. |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
/s/ Pursuant to Fed. R. Crim. P. 4.1
*Complainant's signature*

Ivan A. Rodriguez, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: ____May 27, 2022____

_____
*Judge's signature*

City and state: ____Riverside, California____     Hon. Shashi H. Kewalramani, Magistrate Judge
*Printed name and title*

*AUSA:* John Balla; (951) 276-6246

## AFFIDAVIT

I, Ivan A. Rodriguez, being duly sworn, declare and state as follows:

## PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against Anthony CERVANTES for violating 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii)(II) (possession with the intent to distribute 500 grams or more of cocaine) and 846 (conspiracy to distribute controlled substances) (collectively, the "Subject Offenses").

2.    This affidavit is also made in support of an application for a warrant to search the premises (the "SUBJECT PREMISES"), which is listed below and defined in Attachment A, and to seize evidence, fruits, and instrumentalities of criminal violations of the Subject Offenses.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## PREMISES TO BE SEARCHED

4.     The SUBJECT PREMISES is described in Attachment A, and as follows:

     a.     7615 Sterling Ave., San Bernardino, more fully described in Attachment A, which is incorporated herein by reference.

## BACKGROUND OF AFFIANT

5.     I am an investigator or law enforcement officer of the United States, within the meaning of Title 18, United States Code, Section 2510(7), and I am empowered by law to conduct investigations of, and to make arrests for, the offenses enumerated in Title 18, United States Code, Section 2516.

6.     I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA") and have been so employed since July of 2012.  Before serving with the DEA, I served six years in the United States Air Force and one year as a Border Patrol Agent with Customs and Border Protection.  I have received 16 weeks of specialized training in Quantico, Virginia, pertaining to narcotics trafficking, money laundering, undercover operations, and electronic and physical surveillance procedures. Additionally, I have attended specialized training in wire and electronic interceptions and the use of wire and electronic interception equipment.  I have been involved in numerous investigations dealing with the possession, manufacturing, distribution, and importation of controlled substances.  I am currently assigned to the DEA District Office in Riverside, California, Enforcement Group 2 ("ENF-2") investigating offenses

2

related to controlled substance trafficking and money laundering.

7.    I have participated in numerous investigations of controlled substance trafficking.  I have also participated in the debriefing of a significant number of defendants, informants, and witnesses who had personal knowledge regarding major controlled substance trafficking organizations. Additionally, I have participated in many aspects of drug investigations, including conducting surveillance and conducting court-ordered interceptions of wire communications.  Through these investigations, my training and experience, and my conversations with other experienced law enforcement investigators, I have become familiar with the methods used by drug traffickers to smuggle and safeguard controlled substances, to distribute controlled substances, and to collect and launder proceeds related to the sales of controlled substances.  I am familiar with the methods employed by large-scale drug trafficking organizations in attempts to thwart detection by law enforcement including, but not limited to, the use of cellular telephone technology, counter-surveillance techniques, elaborately planned smuggling schemes tied to legitimate businesses, false or fictitious identities, and coded communications and conversations.  For example, I am aware that drug traffickers often communicate with their drug-trafficking associates through the use of cellular telephones and smart phone devices.  I am also aware that controlled substance traffickers frequently use coded and/or vague language to refer

to drugs and when discussing transportation of or transactions involving controlled substances, in order to conceal their activities from law enforcement.

## SUMMARY OF PROBABLE CAUSE

8.   On May 26, 2022, the Honorable Sheri Pym, United States Magistrate Judge for the Central District of California, issued numerous search warrants related to an investigation into CERVANTES and his brother's drug trafficking.  One of those warrants allowed agents to search CERVANTES's apartment located at 26000 W. Lugonia Ave., Apt. 4423, Redlands, California.  I have attached DEA SA Dante Matthews's affidavit in support of the application for that warrant, and I incorporate it here by reference.

9.   Other agents and I executed the warrants this morning, and we found approximately one kilogram of suspected cocaine and about $80,000 cash at CERVANTES's apartment.  When speaking with CERVANTES, he said that he had another $150,000 cash at his business, the SUBJECT PREMISES.

## STATEMENT OF PROBABLE CAUSE

10.   Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

11.   On May 27, 2022, at approximately 6:00 a.m., I participated in executing the search warrant for CERVANTES's residence in Redlands.  During the search, officers encountered CERVANTES at the location, and he was detained.  Officers also encountered his girlfriend and minor children.

12.   Officers executing the warrant saw a money counter in the kitchen with bulk cash near the money counter.  Officers also found several bundles of cash in a drawer in the kitchen. DEA agents seized the bulk cash as suspected illegal proceeds. In total, we seized about $80,000.

13.   Officers also located a red lunch bag in the living room area, near an inflatable bed, which contained plastic container with vacuumed sealed package within the container.

14.   In the living room area, officer also located another lunch bag that contained induvial wrapped bundles of a white powdery substance.  Based on my training and experience, I believe the bundles are street-level distribution amounts of cocaine.  Based of surveillance noted on the prior search warrant affidavit, it is consistent with CERVANTES's hand-to-hand transactions observed on surveillance on May 13, 2022.  TFO Edward Flores weighed the vacuumed sealed bundles, with an approximate weight of 1,066.6 grams.  TFO Flores conducted a field test of the white powder, which tested positive to the characteristics of cocaine.

15.   In the bedroom, officers found a cellular phone, and CERVANTES acknowledged that it was his.  Officers dialed the phone number that his brother had previously dialed from the patrol car, detailed in the previous search warrant affidavit, and it was the same phone.

16.   SA Jassmine Yeagley, TFO Edward Flores, and I conducted a custodial interview of CERVANTES.  At approximately 6:35 a.m., I read CERVANTES his Miranda rights, to which he

stated he understood and agreed to speak with the officers. During the interview, CERVANTES stated that he does use cocaine and had user amounts[1] in the residence and in his vehicle. CERVANTES did not want to speak about the other drugs located inside the residence (meaning the kilogram). CERVANTES stated that he did purchase the money counter, and the bulk currency was from a recent sale of a vehicle. CERVANTES was asked if any other bulk currency was in the residence, he stated that approximately $150,000 was located at his business, Premier Tire Shop, and he gave the address of the SUBJECT PREMISES. CERVANTES stated the money is used for the business to buy inventory for the tire shop. Based on my training and experience, I know drug traffickers often conceal illegal proceeds as well as their narcotics, digital devices, ledgers, firearms, and other aspects of their drug trafficking, in businesses in an attempt to disguise the proceeds as legitimate and to keep the other evidence separate from their homes.

## TRAINING AND EXPERIENCE ON DRUG OFFENSES

50. As a result of my law enforcement training and experience in narcotics and money laundering investigations, I have developed a detailed understanding of narcotics conspiracies and related illegal activities by criminal DTOs and their associates. Such understanding is detailed in the following paragraphs.

---

[1] In my training and experience, the vacuum-sealed kilogram of cocaine is far more than a user would possess for personal use, and the "user amounts" found elsewhere were more consistent with cocaine being pre-packaged for distribution to others. Users would not typically buy multiple small packages at once.

51.   Narcotics conspiracies and the distribution of narcotics and controlled substances are frequently continuing criminal enterprises which span over months, and often, years. Narcotics traffickers, especially those connected to international DTOs, who appear to have access to large quantities of opioids like fentanyl typically will obtain and distribute narcotics and controlled substances on a regular basis, like any distributor of a legitimate commodity would purchase inventory for sale.   Such narcotics traffickers will have an "inventory" which will fluctuate in size depending on the demand for the product.

52.   Traffickers commonly maintain those items described in Attachment B, including records relating to the manufacture, transportation, ordering, sale, and distribution of illegal narcotics and controlled substances.   For instance, traffickers commonly employ a consignment system where they "front" illegal narcotics and controlled substances to their customers and thus keep some type of records concerning monies owed and payments made.   The records are often maintained where the trafficker in illegal narcotics and controlled substances has ready access to them, or where the trafficker believes the records would be safe, such as the trafficker's residence, places of business, and/or vehicles, as well as locations from which the drug trafficker conducts drug transactions.   The records are often maintained in secure and concealed locations as to hide them from not only law enforcement but unwitting members of the household.   In addition, I understand that the case law in the

Ninth Circuit establishes a general presumption that individuals involved in drug trafficking conspiracies, including their assistants, maintain evidence of these crimes in their residences.[2]  Typically, these records are kept whether or not the narcotics trafficker is in actual possession of narcotics or illegal controlled substances at any given moment.  In my experience, the records maintained by narcotics traffickers include: Drug, money, and other types of ledgers; sheets showing payments and debts called "pay/owe sheets"; Distributor, supplier, and customer lists; Correspondence, books, logs, receipts, journals and other documents noting drug prices and quantities, and/or the times where narcotics and controlled substances were obtained, transferred, sold, distributed, and/or concealed; photographs, videos, and other depictions of narcotics and controlled substances; leases and rental agreements, escrow documents, utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, vehicle title documents, automobile registration records, keys, and other indicia of ownership and occupancy over residences, businesses, and vehicles used for the storage of narcotics and narcotics proceeds; airline tickets, itineraries, and/or shipping

---

[2]  See, e.g., United States v. Fannin, 817 F.2d 1379, 1382 (9th Cir. 1987) ("[E]vidence discovered by [] officers linking the defendants to a drug scheme provide[s] 'more than a sufficient showing for obtaining the warrant to search [their] . . . residence.'" (interal quotation marks and citation omitted)); United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986) ("In the case of drug dealers, evidence is likely to be found where the dealers live."; "When the traffickers consist of a ringleader and assistants, a fair probability exists that drugs will be present at the assistants' residence as well as the ringleader's." (citations omitted)).

information relating to the transportation of narcotics and controlled substances.

53.  It is common for narcotics traffickers to secrete contraband, records of drug transactions, large amounts of currency (currency in amounts of $1,000 or more), financial instruments, precious metals, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in narcotics trafficking activities in secure locations in their residences or the curtilage of their residences (including in garages and storage containers located on such premises), in their vehicles, and in their businesses for ready access and to conceal them from law enforcement as well as unwitting members of the household.

54.  Since drug trafficking is an ongoing criminal enterprise, narcotics traffickers typically will keep records associated with their narcotics activities for an extended period of time, especially since such records are vital to the orderly operation of a narcotics enterprise.  Indeed, I have observed that many narcotics traffickers (even including more sophisticated ones) oftentimes are unaware or are less sensitive to the fact that these records generally can provide substantial circumstantial evidence of large-volume narcotics sales. Because possession of the documents themselves, unlike possession of narcotics, is not illegal, narcotics traffickers often fail to take precautions to destroy the documentation.

Therefore, documentation may survive for many months, sometimes years, after a large volume drug transaction has occurred, often in the traffickers' residences and vehicles.  Such documentation may be in hard copy form or stored in digital devices such as cell telephones and other mobile communication devices.

55.  Narcotics traffickers often keep on hand large amounts of United States currency in order to maintain and finance their ongoing drug businesses, which operate on a cash basis.  This cash is typically stored in various locations, including the traffickers' residences, places of business, and the residences of their close associates, as well as in automobiles, storage lockers, safes, and safety deposit boxes.

56.  When traffickers amass large quantities of cash from the sale of narcotics, they often attempt to legitimize these profits through the use of foreign and domestic banks and financial institutions and their attendant services that include false and fictitious business records and accounts, securities, cashier's checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit, brokerage house documents, real estate corporations, business fronts, and safe deposit boxes.  As a result, business records and financial instruments are often found in locations where traffickers store other records of their narcotics activities.

57.  Narcotics traffickers often use cellular telephones and other communication devices sometimes in fictitious and/or other individual's names, such as in this investigation.  Traffickers commonly receive telephone calls and voicemail

messages from individuals seeking to conduct narcotics transactions.  As a result, traffickers often maintain in their residences, vehicles, and locations where they conduct transactions, records and items that reflect or contain names, addresses, and/or telephone numbers for their associates and co-conspirators in the drug trafficking organization.  These records and items include telephone address books and telephone listings, text messages, voice mails, as well as letters, telephone bills, e-mails, and personal notes reflecting names, identities, addresses, and telephone numbers.  Traffickers often keep records and evidence of their illegal activities for a period of time extending beyond during which they actually possessed illegal narcotics and controlled substances, in order to maintain contact with their criminal associates for future drug transactions, and so that they can have records of prior transactions for which a trafficker might still be owed money, or might owe someone else money.

58.  Narcotics traffickers often take or cause to be taken photographs of themselves, their associates, their property, and their products, and these traffickers usually maintain these photographs in their residences, vehicles, and/or businesses.

59.  Narcotics traffickers often drive different vehicles to avoid being identified as driving one particular vehicle with an identifiable license plate in order to thwart investigation of their illegal activities, and the vehicles which narcotics traffickers use to transport narcotics and controlled substances contain traces or physical evidence of narcotics controlled

substances, large amounts of cash earned from illegal drug transactions, concealed weapons, and communication devices such as cell phones, smart phone, or blackberries.

60.  Narcotics traffickers commonly use handguns and other firearms to protect themselves, their contraband, and the proceeds from their drug trafficking activities.  Narcotics traffickers commonly use coded language to refer to narcotics operations and along the same lines, narcotics traffickers commonly change phone numbers to avoid detection by law enforcement.

61.  Narcotics traffickers commonly use hidden compartments when transporting narcotics and or narcotics proceeds in vehicles.  It is common for narcotics traffickers to use natural voids in vehicles or manufactured locations known as "traps" in order to thwart the detection of law enforcement.

### TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

17.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

    18.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

        a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

        b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of

data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

19.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

20.   In some circumstances, fingerprint sensors will not work, and a passcode must be entered to unlock the device.  For example, with Apple, Touch ID will not work if (1) more than 48 hours have passed since the device has been unlocked, (2) the device has been turned on or restarted, (3) the device has received a remote lock command, or (4) five attempts to match a fingerprint have been unsuccessful.  Other brands have similar restrictions.  I do not know the passcodes of the devices likely to be found at the SUBJECT PREMISES.

21.   For these reasons, while executing the warrant, agents will likely need to use the fingerprints or thumbprints of any user(s) of any fingerprint sensor-enabled device(s) to attempt to gain access to that device while executing the search warrant.  The warrant seeks the authority to compel the use of the fingerprint and/or thumbprint of every person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant.  The government may not be able to obtain the contents of the devices if those fingerprints are not used to access the devices by depressing them against the fingerprint sensor at the time of the search.  Although I do not know which of the fingers are authorized to access on any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors, and in

any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

22.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### CONCLUSION

23.   For all of the reasons described above, there is probable cause to believe that CERVANTES has committed a violation of the Subject Offenses.

24.   Further, for all of the reasons described above, there is probable cause to believe that evidence, fruits, or instrumentalities of the Subject Offenses will be found at the SUBJECT PREMISES.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 27th  day of May,
2022.

_____
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

**PREMISES TO BE SEARCHED**

The premises to be searched are as follows: 7615 Sterling Ave, San Bernardino, California (the "SUBJECT PREMISES").  The SUBJECT PREMISES is a tire shop business located southeast corner of Sterling Ave. and 9th Street.

The places to be searched includes (a) all rooms, porches, containers, and safes in the SUBJECT PREMISES; and (b) the driveway, and any garages, carports, storage spaces, or other outbuildings on the SUBJECT PREMISES; (c) any vehicles parked on the SUBJECT PREMISES; and (d) any digital devices found at the SUBJECT PREMISES.

**ATTACHMENT B**

**I.  ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii)(II) (possession with the intent to distribute 500 grams or more of cocaine)), and 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), namely:

a.    Any controlled substance, controlled substance analogue, or listed chemical;

b.    Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.    Firearms, ammunition, and firearm parts;

d.    Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

e.    United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining

to, obtaining, possessing, using, applications for, or transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

f.   Jewelry, precious metals, or other items of value constituting evidence of unexplained wealth;

g.   Any records, documents, programs, applications, or materials reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items commonly obtained with the proceeds of drug trafficking activities;

h.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

i.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

j.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

k.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

l.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

m.   Contents of any calendar or date book;

n.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations from May 27, 2021, to the present; and

o.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

p.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser

iv

history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II. <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

4.   In searching digital devices (or forensic copies
thereof), law enforcement personnel executing this search
warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool

vi

Kit), which tools may use hashing and other sophisticated techniques.

       c.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

       d.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

       e.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

       f.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

       g.  The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been

able to fully search a device because the device or files contained therein is/are encrypted.

        h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

    5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

        a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

        b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

        c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

        d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

        e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

        f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

1.   During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumb and/or fingers every person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the SUBJECT PREMISES and falls within the scope of the warrant onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of every person who is located at the SUBJECT PREMISES during the execution of the search and who is reasonably believed by law enforcement to be a user of a device with a facial-, iris-, or retina-recognition feature that is located at the SUBJECT PREMISES and falls within the scope of the warrant, with his or

her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

x

# EXHIBIT
# 1

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means (USAO Rev. 12/20)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | |
|---|---|
| In the Matter of the Search of )<br><br>*(Briefly describe the property to be searched or identify the person by name and address)* )<br><br>26000 West Lugonia Avenue, Apartment 4423 )<br>Redlands, California 92374 )<br>)<br>)<br>) | **FILED**<br>CLERK, U.S. DISTRICT COURT<br><br>5/26/2022<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ___KC___ DEPUTY |

Case No. 5:22-MJ-00327

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841(a)(1), and 846 | See attached affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

_____
/S/
*Applicant's signature*

DEA Special Agent Dante Matthews
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: __May 26, 2022__

_____
*Judge's signature*

City and state: Riverside, CA

Honorable Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: John A. Balla (951-276-6246)

**AFFIDAVIT**

I, Dante Matthews, being duly sworn, declare and state as follows:

**PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of an application for issuance of search warrants to search the premises (and vehicles, which are listed below and defined in Attachments A-1 through A-11, and to seize evidence, fruits, and instrumentalities of criminal violations of 21 U.S.C. §§ 841(a)(1) (distribution and possession with the intent to distribute controlled substances) and 846 (conspiracy to distribute controlled substances) (collectively, the "Subject Offenses").

2.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants, and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

**PREMISES AND VEHICLES TO BE SEARCHED**

3.    The premises to be searched are described in Attachments A-1, A-2, and A-3, incorporated here by reference (collectively, "SUBJECT PREMISES"), and as follows:

a.   26000 West Lugonia Avenue, Apartment 4423, Redlands, California, more fully described in Attachment A-1 ("SUBJECT PREMISES 1");

b.   16492 Medinah Street, Fontana, California, more fully described in Attachment A-2 ("SUBJECT PREMISES 2"); and

c.   2714 Valmar Circle, Highland, California, more fully described in Attachment A-3 ("SUBJECT PREMISES 3").

4.   The vehicles to be searched are described in Attachments A-4 through A-11, incorporated here by reference (collectively, the "SUBJECT VEHICLES"):

a. a black 2021 Mercedes-Benz SUV bearing California license plate number 8ULP845 (VIN:4JGFD6BB3MA400565), more fully described in Attachment A-4, registered to Cecilia Ramirez, 231 S. Sutter St., San Bernardino, California ("SUBJECT VEHICLE 1");

b. a grey 2015 Mercedes-Benz SUV bearing California license plate 8GRL266 (VIN: WDDUG8CB1FA201486), more fully described in Attachment A-5, with a salvage title previously registered to Andy CERVANTES Sanchez, 2714 Valmar Circle, Highland, California ("SUBJECT VEHCILE 2");

c. a black 2016 Honda sedan bearing California license plate 8HIZ791 (VIN: 2HGFC4B07GH313768), more fully described in Attachment A-6, registered to Maria Elena Cervantes, 2714 Valmar Circle, Highland, California ("SUBJECT VEHICLE 3");

d. a white 2018 Cadillac sedan bearing California license plate 8VDK932 (VIN: 1G6AA5RX7J0181472), more fully

2

described in Attachment A-7, registered to Maria E. Cervantes, 2714 Valmar Circle, Highland, California ("SUBJECT VEHICLE 4");

e. an orange 1959 Chevy pick-up truck bearing California license plate 8YGF533 (VIN: F59L197954), more fully described in Attachment A-8, registered to Maria Elena Cervantes, 2714 Valmar Circle, Highland, California ("SUBJECT VEHICLE 5");

f. a white 2019 Ford pick-up truck bearing California license plate 88005R2 (VIN: 1FTEX1RG8KFA87377), more fully described in Attachment A-9, registered to Maria Elena Cervantes, 2714 Valmar Circle, Highland, California ("SUBJECT VEHICLE 6");

g. a grey 2019 Dodge coupe bearing California license plate 8ZKA164 (VIN: 2C3CDZL9XKH501951), more fully described in Attachment A-10, registered to Andy CERVANTES Sanchez, 2714 Valmar Circle, Highland, California ("SUBJECT VEHICLE 7"); and

h. a red 2017 Ford pick-up truck bearing California license plate 44009Z2 (VIN: 1FT8W3DT1HEB26504), more fully described in Attachment A-11, registered to Andy CERVANTES Sanchez, 2714 Valmar Circle, Highland, California ("SUBJECT VEHICLE 8").

## BACKGROUND OF AFFIANT

5.    I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered to conduct investigations of, and to make arrests for, federal felony offenses enumerated in 18 U.S.C. § 2516.

6.    I am a Special Agent ("SA") of the Drug Enforcement
Administration ("DEA") and have been so employed since September
2020.  I am currently assigned to the Los Angeles Field
Division, Riverside District Office, in Riverside, California,
and my responsibilities include investigating large-scale drug
trafficking organizations operating in the Southern California
area and elsewhere.

7.    I attended the DEA fourteen-week training academy
located in Quantico, Virginia.  While at the DEA training
academy, I received formal training in investigative techniques,
drug identification, and the laws pertaining to drug
investigations.  I have received on-the-job training from
supervisors, and other agents regarding the illegal trafficking
of controlled substances.  Prior to employment as a Special
Agent, I was employed as a Border Patrol Agent, where I attended
a twenty-week training academy at the Federal Law Enforcement
Training Center in Artesia, New Mexico, and then assigned to the
Tucson Sector, Ajo Border Patrol Station for two years.

8.    By virtue of my employment as a Federal Agent, I have
participated in drug investigations, which have included the use
of confidential sources and undercover officers, physical
surveillance, electronic surveillance, the execution of search
and arrest warrants, telephone toll analysis, the arrests of
drug traffickers, and the analysis of seized records, physical
evidence, and taped conversations.  Over the course of my
employment as a law enforcement officer, I have participated in
investigations that involve one or all of the following crimes:

possession, distribution, possession with intent to distribute, and manufacture of controlled substances; and international human and drug smuggling.  I have assisted in the execution of multiple search warrants and have spoken with defendants, confidential informants, and other witnesses who have extensive knowledge of large-scale narcotics trafficking organizations. In addition, I have spoken with other experienced narcotics investigators concerning the methods and practices of drug traffickers.

9.   Based on my training and experience, my conversations with other law enforcement personnel, and my own participation in this investigation, I have become familiar with the criminal activities of individuals involved in drug trafficking organizations, including drug manufacturing, drug distribution, and money laundering.  I am also aware of the tactics and methods employed by such individuals to avoid detection by law enforcement, including the use of multiple wireless telephones, pre-paid cellular telephones, cloned communication devices, debit calling cards, public pay telephones, counter-surveillance techniques, false or fictitious identities, coded and ambiguous language in conversations, multiple vehicles, and vehicles with concealed compartments.

### SUMMARY OF PROBABLE CAUSE

10.   DEA is currently investigating brothers Andy Cervantes Sanchez ("Andy") and Anthony Cervantes ("Anthony") for trafficking drugs.  A grand jury in the Central District of California recently returned an indictment against Andy in ED CR

No. 22-126-JLS for an incident where California Highway Patrol ("CHP") stopped Andy driving a white Cadillac[1] with a kilogram of cocaine, about $8,000, and two cell phones. Agents plan to execute the requested warrants when they arrest Andy on the indictment.

11. Agents have interviewed the brothers' father, Antonio Cervantes ("Antonio"), searched one of Andy's cell phones, and conducted other surveillance and investigation into the brothers. This investigation has revealed that Andy and Anthony are trafficking drugs together.

12. SUBJECT PREMISES 1 is an apartment where Anthony resides. Agents have tied Anthony to this address based on (1) a rental application on Andy's phone listing Anthony as a reference and listing Anthony's address as SUBJECT PREMISES 1, and (2) surveillance where agents saw Anthony walking into the apartment building where SUBJECT PREMISES 1 is located. Following Andy's arrest, Andy called Anthony from the back of the patrol car using his phone's voice-dial function. He asked Anthony if Anthony had moved "the stuff" from their mother's (Maria Cervantes, or "Maria") home, and Anthony stated that he moved "the blocks." Based on my training and experience, "the stuff" and "the blocks" referred to other bundles of narcotics, and Anthony likely would have moved them to his home. Further, in my training and experience, drug traffickers often keep many

---

[1] Agents have already seized the white Cadillac, so I am not applying to search it.

items related to their drug trafficking, detailed more below, in their homes and their vehicles.

13.  SUBJECT PREMISES 2 is a home where Andy resides. Though Andy seemed to lie about his residence during an interview with DEA, agents have tied Andy to this address based on (1) surveillance showing a car registered in Andy's name in the driveway, (2) records from Andy's phone showing him applying to rent SUBJECT PREMISES 2 and then subsequently obtaining a renter's insurance policy through January 2023 and applying to turn on gas service at SUBJECT PREMISES 2, (3) Experian records showing Andy associated with SUBJECT PREMISES 2, (4) an interview with Antonio where Antonio said that Andy lives in the area of Fontana where SUBJECT PREMISES 2 is located, and (5) license plate reader records showing the white Cadillac driving in the area near SUBJECT PREMISES 2 in days leading up to Andy's arrest and release.  On top of my general training and experience regarding drug traffickers keeping certain items in their residences and vehicles, Andy's phone contains, among other things, videos of him counting large amounts of cash inside SUBJECT PREMISES 2.

14.  SUBJECT PREMISES 3 is a home where Antonio and Maria reside.  As summarized above, Andy called Anthony following his arrest and indicated that he had been storing narcotics at his "mom's house."  Further, Andy indicated in an interview that he often kept things at his parents' house, and agents have seen his cars at SUBJECT PREMISES 3 on surveillance.

15.   SUBJECT VEHICLE 1, although registered in another's name, is a vehicle used by Andy.  Agents have seen SUBJECT VEHICLE 1 parked in front of SUBJECT PREMISES 3, and Andy's phone contained conversations and records related to his recent purchase of SUBJECT VEHICLE 1.

16.   SUBJECT VEHICLE 2 is a vehicle used by Andy and Anthony.  In an interview with agents, Andy described how he previously owned a vehicle that matched the description of SUBJECT VEHICLE 2 before he wrecked it.  This lined up with SUBJECT VEHICLE 2's salvage title.  During surveillance on May 13, 2022, agents saw Anthony drive to his parents' home, SUBJECT PREMISES 3, drive to another apartment complex and appear to conduct a hand-to-hand drug transaction, and then drive back to his apartment, SUBJECT PREMISES 1, and conduct what again appeared to be a hand-to-hand drug transaction, all in SUBJECT VEHICLE 2.

17.   SUBJECT VEHICLES 3, 4, and 5 are vehicles used by Antonio and Maria.  Though agents have not seen Andy or Anthony driving them, Antonio told DEA agents that he lets his children use his vehicles.  Further, as detailed more below, the Cervantes family engages in the common drug-trafficker tactic of registering vehicles in each other's names to distance themselves from the vehicles.  Our investigation of the white Cadillac in which Andy was arrested showed a transparent attempt to transfer the car from Andy, the true owner, to Antonio after his arrest, and it showed that Antonio forged DMV documents as part of this scheme.  In addition, during the phone call in the

8

back of the patrol car, Andy and Anthony discussed how they had been storing "the blocks" at their "mom's house."  This suggests that Maria and Antonio are generally complicit in their sons' drug trafficking, and it suggests a fair probability, in my training and experience, that Andy and Antonio could be using their parents' vehicles in the same way that a drug trafficker would use his own vehicles.  Finally, though Andy appeared to be minimizing his own criminal liability, he obliquely suggested that Antonio may have been responsible for the cocaine seized from Andy during his arrest.

18.  SUBJECT VEHICLE 6 appears to be a vehicle used by Andy.  Though the vehicle is registered to Maria and though agents have seen it in front of SUBJECT PREMISES 3, videos on Andy's phone showed him driving it and talking about modifying it.

19.  SUBJECT VEHICLE 7 is a vehicle used by Andy.  It's registered in his name, and agents on surveillance saw SUBJECT VEHICLE 7 parked in front of SUBJECT PREMISES 2.  Andy's phone also contained videos of him driving it and getting it serviced.

20.  SUBJECT VEHICLE 8 is a vehicle used by Andy.  It's registered in his name, and agents on surveillance saw SUBJECT VEHICLE 8 parked in front of SUBJECT PREMISES 3.

<u>**STATEMENT OF PROBABLE CAUSE**</u>

21.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    CHP Officers Stop Andy with More than 1kg of Cocaine and more than $8,000 Cash**

22.    On March 23, 2022, CHP officers stopped Andy while he was driving a Cadillac SUV carrying his girlfriend, their child, more than 1 kilogram of cocaine, and more than $8,000.  I previously obtained a warrant to search Andy's cellular phones, signed by the Honorable Sheri Pym, United States Magistrate Judge for the Central District of California.  I have attached my affidavit in support of that search warrant here has Exhibit 1, and I incorporate it by reference.  I am supplementing my previous affidavit with the additional facts from the incident and my interview with Andy, which I believe are relevant to the warrants I now request.

**a. Additional Traffic Stop Footage**

23.    On April 25, 2022, DEA SA Ivan Rodriguez and I received a DVD containing dash camera footage of the traffic stop from CHP Officer J. Ellsworth.  SA Rodriguez, Intelligence Analyst Veronica Negrete, and I reviewed the footage.

24.    On the dash camera footage, investigators observed that the footage contained two camera views recording simultaneously: one facing the front of the CHP patrol vehicle facing outward, and one facing the back seat inside the patrol vehicle.  The footage captured sound from both inside and outside the vehicle.

25.    After being detained during the traffic stop, Andy was handcuffed and placed in the back seat of CHP Officer Valadez's patrol vehicle, and his cellular phones were placed in the front

10

seat.  While in the back of the patrol vehicle, Andy used the
Siri function on his iPhone to place at least two successful
calls on his phone.

26.  Andy asked Siri to place a call to "A" and put her
("A") on the speaker.  After many failed attempts of Siri
placing a call to "A," Andy asked Siri to place a call to phone
number 909-589-4152 and put her ("A") on the speaker.  I
recognized this number as the number Angelica used to call the
CHP San Bernardino station on March 24, 2022, to inquire about
the Cadillac Escalade seized during the March 23, 2022, traffic
stop.  On March 30, 2022, I called Angelica at the number 909-
589-4152 to set up a time to return personal property found
during the inventory search of the Cadillac Escalade.

27.  Andy is heard speaking to Angelica.  He told her, "You
need to say it was yours and I'll have you out by the morning.
I can't go in; it's a violation of my probation.  Just say the
stuff--all the stuff was yours."  She responded, in a concerned
tone, "You want me to do that right now?  Andy, I'll lose my
job."  Andy responded, "It's fine, I'm not going to let you lose
your job."  Angelica said, "We can't like, just try to bail you
out?"  Andy responded that he wouldn't be able to bail out if he
committed another offense while on bail.  Andy then seemed to
worry that an officer was coming back to the car, so he told
Angelica to hang up.

28.  Once he saw that the coast was clear, Andy asked Siri
to call "Ace" and put him on the speaker.  During a search of
Andy's phones seized during the traffic shop, I found a contact

in his phone named "Ace" with the number 909-662-4949.
Investigators also found picture of a house-rental application
for Andy.  On the rental application, Andy listed his brother,
Anthony, with the phone number 909-662-4949 and an address of
SUBJECT PREMISES 1, as a reference.  Based on this and based on
Andy referring to "Ace" as Anthony in a call summarized below, I
believe that the "Ace" with whom Andy spoke was his brother
Anthony.

29.    Andy spoke to Anthony in Spanish and asked if Anthony
was at their mom's house (which I believe is SUBJECT PREMISES 3,
as detailed below).  Anthony said he was not.  Andy asked if
Anthony took out "the stuff" at his mom's house.  Anthony said
he did and was cleaning everything up.  Anthony said he went to
drop off "the blocks" that were there to another house.[2]  When
Anthony asks why, Andy responded, "They found it in my
backpack."  Andy said that was fine and added that the police
officer let Angelica leave.  Andy said the police would arrive
to the house and check what was there.  Anthony told Andy to say
he had purchased the truck like that and found it inside
(implying that Andy should claim that he had just bought the
Cadillac and didn't know that there was cocaine inside).  Andy
repeated that officers found it in his backpack.  Andy then told
Anthony to hang up the phone, presumably worried that an officer
was returning.  Of note, Andy provided no context at the
beginning of the conversation indicating what exactly had

_____

[2] Based on my training and experience and the context of the
rest of the conversation, I believe "the blocks" refers to other
bundles of narcotics.

happened.  They immediately began speaking in vague terms that clearly referred to drug-trafficking activity.  In other words, the context of the conversation clearly indicated that Andy and Anthony had a pre-existing relationship related to drug trafficking.

30.  Andy then asked Siri to send a text to "Ace" saying to call his father.

31.  Andy then asked Siri to call "Ace."  Andy addressed "Ace" as Anthony and said he was not sure if Anthony could hear him.  Andy said he was told the police would call his father and his father would be asked if the stuff was his.  Andy said if his father said the stuff was his, he would be released; otherwise, Andy would be sent to jail due to his other charges. Andy then told Anthony to hang up the phone right away.

32.  Andy again asked Siri to call "Ace" and put him on speaker multiple times, but each attempt fails.

**b. Additional Details from Interview**

33.  During the interview, Andy stated that he used to live at his parents', Antonio and Maria, house at SUBJECT PREMISES 3, but he currently lives with his girlfriend's apartment in Grand Terrace, California.  Andy stated he has been living at the apartment in Grand Terrace for approximately three weeks, but he did not know the address of the apartment.  Andy stated he thought the apartments were The Tides Apartments in Grand Terrace.  I located the Tides Apartments at 1699 E. Washington Street, Colton, California 92324.  I showed Andy the Tides Apartments on a map and asked Andy if the area looked like where

he lived.  Andy stated he did not recognize the Tides
Apartments.  Andy said that he remembers the apartments he lives
in are off Interstate 215 near Mor Furniture.  I located Mor
Furniture for Less at 1210 E. Washington Street, Colton,
California.  I showed Andy the Mor Furniture for Less and asked
Andy to show where his apartment was on the map.  Andy pointed
to an apartment complex located at 11826 Greenbrier Lane, Grand
Terrace, California 92313.

34.  Andy stated that he currently owns a barber shop
called The Nines Barber Shop, located at 1498A N. Mt. Vernon
Avenue, Colton, California.  I found an Instagram page for The
Nines Barber Shop and noticed a post soliciting barbers, along
with Andy's phone number 909-677-8554.  Andy stated that he also
works in janitorial services for ABM Industries.  Andy stated
that he works at ABM Industries to lower his tax liability with
his barber shop.  Andy stated he reports approximately $60,000
to $70,000 a year in income for tax purposes.

35.  Andy stated that he currently does not have a vehicle.
Andy stated that he had a Mercedes S-Class car, but he totaled
the car in a hit-and-run accident approximately two months
earlier.  TFO Callahan asked Andy if there was any documentation
of the accident.  Andy stated there was no police report, he did
not have insurance, and the vehicle was registered to his
mother's name rather than his.  Andy stated that prior to
driving the Mercedes S-Class, CERVANTES Sanchez drove another
Mercedes S-Class, which was also totaled in a vehicle accident.
Database searches confirmed that CERVANTES previously owned

14

SUBJECT VEHICLE 2.[3]  DMV records show that SUBJECT VEHICLE 2 was issued a salvage title on August 20, 2020, and currently had no registered owner.  Andy did not give any more detail about the previous vehicles.  Andy stated that because he didn't have a vehicle, he shared his girlfriend's car.

36.  Andy stated that on March 23, 2022, prior to being pulled over, Angelica's vehicle had a check engine light, which made her not want to drive it.  Andy stated that he asked Antonio to borrow his 2021 Cadillac SUV, with the California License plate 8ZZVD040, registered to Eric Sassenberg at 19772 Potomac Lane.  Andy stated that Angelica dropped Andy off at SUBJECT PREMISES 3 in Angelica's vehicle to pick up the Cadillac SUV.  Andy stated that Antonio was given the Cadillac either Sunday or Monday in lieu of payment from his contracting job in construction/roofing/taxes.  Andy stated that he did not know whether Antonio paid for the Cadillac or not.  Andy stated that Antonio also has a white Dodge Ram truck that he uses for work.  Andy stated that Antonio told Andy to fill the Cadillac's tires with air.  Andy claimed that it was his first time driving the Cadillac.

37.  Andy stated that he drove the Cadillac to a tire shop to get air in the tires on the way to pick up Angelica and their two-year-old son.  Andy stated that he did not know the name of the tire shop that he stopped at, but he knew it was on Sterling Avenue in Highland, California.  I attempted to find the tire

---

[3] As detailed below, surveillance showed Anthony driving SUBJECT VEHICLE 2 and using it for what appeared to be hand-to-hand drug transactions.

shop on a map and asked Andy where the tire shop was on Sterling
Avenue.  Andy stated that the tire shop was at the corner of
Sterling Avenue and E Ninth Street.  I found Premier Tire Shop
located at 7615 Sterling Avenue, Highland, California, and asked
Andy if that was it.  Andy stated that Premier Tire Shop was the
shop he stopped at.  I asked Andy why he stopped at that tire
shop instead of others.  Andy stated that the tire shop is owned
by his uncle, Augustine Cervantes.

38.  Andy stated that after leaving the tire shop, he drove
to Angelica's apartment to pick up Angelica and their son.  Andy
stated that after picking up Angelica and their son, Andy drove
back to SUBJECT PREMISES 3 to get something to eat.  Andy later
stated that he was driving to SUBJECT PREMISES 3 to trade the
Cadillac SUV with his mother Maria for SUBJECT VEHICLE 4.  Andy
stated that he did not want to borrow a big vehicle because gas
prices were too high.

39.  We asked Andy about the Louis Vuitton bag in which
officers found the cocaine and $8,000 cash.  Andy stated that
the Louis Vuitton bag was his and that he got it for Father's
Day a couple of years ago.  Andy stated that he paid
approximately $2,000, and Angelica paid $2,000 for the bag which
was approximately $4,000 in total.  Andy stated that he left the
Louis Vuitton bag at his parents' house at SUBJECT PREMISES 3
when he was living with them.  Andy stated Antonio asked Andy if
he could use the bag.  Andy stated that he allowed his family
members to use his Louis Vuitton bag.  Andy stated that the
Louis Vuitton bag was his, but the bag was already in the car

16

prior to borrowing it, and that the contents of the Louis Vuitton bag were not his.

40.    Investigators asked Andy who would have left the cocaine and cash in the Louis Vuitton bag, to which Andy responded that he did not know.  Investigators asked Andy if Antonio is in the business of selling drugs.  Andy stated that he does not talk to Antonio about that kind of stuff.  Andy stated that he goes to work and Antonio goes to work and that was it.  Andy stated that Antonio is a contractor and works in construction, roofing, and taxes.  Andy stated that the only reason he goes to SUBJECT PREMISES 3 is to talk to his mother Maria.

**B.    DEA Investigators Interview Antonio**

41.    On March 29, 2022, DEA SA Marco Garza and I performed a non-custodial interview of Antonio.

42.    SA Garza advised Antonio that he was not under arrest, was free to leave the interview at any time, and was not obligated to answer any of our questions.  SA Garza further explained that at any time Antonio could terminate the interview and consult with his lawyer before answering any further questions.  Antonio stated that he understood his rights and was willing to speak with agents without his lawyer present.  SA Garza advised Antonio that the interview would be recorded and asked Antonio if agents could record the interview.  Antonio responded in the affirmative.

43.    During the interview, Antonio stated that he does income tax, roofing, owns a car wash, and runs a soccer league.

17

Antonio stated he does taxes in Fresno, California, and regularly travels to Fresno and back to San Bernardino, California approximately once a week.

44. Antonio stated that he regularly buys and sells newer cars after putting approximately 10,000 miles on them. Antonio stated that his friend Frank Palma from Fresno showed Antonio a 2021 Cadillac Escalade online. Antonio stated that he contacted the seller of the Cadillac, named "Mike," on a phone call to negotiate buying the Cadillac.[4] Antonio stated that he traveled to Fresno to meet "Mike." Antonio described "Mike" as a tall, older, male with an average build. Antonio stated that he had the dates of the calls with "Mike" but was unable to provide them to investigators.

45. Antonio stated that he bought the Cadillac eight days ago (March 21, 2022). Antonio corrected himself and stated that he bought the Cadillac 15 days ago (March 14, 2022).[5] Antonio stated he sent his son Jerry Steven Sanchez Cervantes ("Jerry") to pick up the car because Antonio is not very proficient in English. Agents noticed inconsistencies in Antonio's story and were aware, from an interview with Sassenberg and from DMV sale records, that Andy met with Sassenberg at Sassenberg's Huntington Beach residence to purchase the vehicle for $115,000 in cash. Antonio further stated that he spoke with the seller

_____

[4] Investigators interviewed the seller of the Cadillac on March 24, 2022, named Eric Sassenberg, who told investigators that he sold the Cadillac to someone from Craigslist.

[5] Investigators were aware through bill of sale and title transfer that the Cadillac was sold by Sassenberg on March 20, 2022.

on the phone but was unable to buy the car himself because he was not proficient in English.

46.   Antonio stated that he and Jerry met to buy the Cadillac at "Mike's" house in Newport Beach, California. Antonio stated that he purchased the Cadillac for $101,000. During the interview with Andy on March 24, 2022, Andy told investigators that he was not sure if Antonio received the vehicle in lieu of services rendered or if Antonio bought the Cadillac.  The Release of Liability for the Cadillac showed the vehicle was sold for $60,000.  Agents asked why Andy stated to investigators on March 24, 2022, that Antonio received the vehicle as payment for services, and Antonio did not know why Andy said that, but he said that it was not true and that he had never met "Mike" until he had meet with him to purchase the vehicle.

47.   During the interview with Sassenberg, Sassenberg told investigators he sold the vehicle for $115,000.  Antonio stated that there are no bank transactions related to the purchase because he bought the Cadillac with cash.

48.   Antonio stated that he had the cash at his house after he sold a Ram TRX pickup truck for $90,000 approximately a month ago.  Antonio stated that he has a bank account with Chase Bank but does not like to use the bank because there was a wait time to make large cash withdrawals.

49.   Antonio stated that he transferred the $101,000 cash to buy the Cadillac in his silver aluminum briefcase.  Antonio stated that Jerry gave the money in the briefcase to "Mike," and

Jerry signed the release of liability on the title.  Sassenberg
told investigators that the person he sold the Cadillac to had
the money in a leather designer bag.  Investigators were aware
that Andy signed the Release of Liability on the title.  Antonio
stated that Jerry drove the Cadillac back from Newport Beach,
California to Antonio's house in Highland, California.

50.  Antonio stated that he had a friend who registered the
Cadillac for Antonio.  Antonio corrected himself and stated that
he went to a vehicle registration business yesterday (March 28,
2022) in San Bernardino, California.  Antonio showed
investigators a California Registration Card for the Cadillac
registered to Antonio at SUBJECT PREMISES 3.  I noticed the
registration card was issued on March 26, 2022, and the fee for
the registration was paid on March 26, 2022 as well, after
Andy's arrest.  On March 31, 2022, I talked to DMV Investigator
Fong Scott.  Investigator Scott stated that Antonio registered
the Cadillac on March 26, 2022, at Millenium Latino Insurance
located at 5261 E. Beverly Blvd., East Los Angeles, California
90022.

51.  Antonio stated that all of his sons have access to his
vehicles.  Antonio stated that Andy lives in Fontana,
California, with his son.  Antonio did not know his son's
address, but he said that Andy has lived in Sierra Lakes for the
last two months.  License plate reader data showed that the
Cadillac was in the area of Sierra Lakes Pkwy. in Fontana,
California, several times between March 20, 2022 and March 23,
2022.  These facts contradict Andy's earlier claim in our

interview that he lived in Grand Terrace, California, with Angelica.  Antonio stated that Jerry lives in Redlands, California.  Antonio stated that his oldest son's name was Anthony.  Antonio did not specify where Anthony lived.

52.  I asked Antonio if he has ever seen Andy with a particular bag.  Antonio stated that he usually sees Andy with a cloth bag.

### C.   **Preliminary Analysis Search Conducted on Phones Seized from Andy**

53.  On May 12, 2022, TFO Callahan received a downloaded search of one of Andy's cell phones obtained under the search warrant previously issued.

54.  We have begun reviewing the contents of the cell phone.  During the search, I have seen pictures, videos, and text messages on Andy's phone that, based on training and experience, indicate Andy's involvement in trafficking cocaine.

a.   I saw the previously mentioned house-rental application where Andy listed Anthony as his reference.  The application was dated January 14, 2022, and it was an application for Andy to live at SUBJECT PREMISES 2.  The application also included Anthony's address, listed as SUBJECT PREMISES 1.  I also found a later renter's insurance policy where Andy received rental insurance for SUBJECT PREMISES 2 for the period of January 28, 2022, through January 28, 2023.  I also found a screenshot taken February 4, 2022, of a request to start service from SoCalGas for SUBJECT PREMISES 2.

b.   I saw a video from May 7, 2021, where Andy was inside SUBJECT VEHICLE 6 and boasting about all the modifications he had done to SUBJECT VEHICLE 6.  I recognized it as SUBJECT VEHICLE 6 because he pointed the camera at the steering wheel, which says "RAPTOR," the model of SUBJECT VEHICLE 6, and because I have driven that particular model before.

c.   I saw a photo from March 15, 2022, of what appeared to be SUBJECT VEHICLE 7 being smogged.  I believe it was SUBJECT VEHICLE 7 based on the fact that SUBJECT VEHICLE 7 is registered to Andy and based on its distinct light-gray color.

d.   I saw a picture dated March 22, 2020, of a hand holding a white powdery brick shaped object in front of a building blueprint.

e.   I saw a picture dated March 22, 2020, of a white powdery brick shaped object broken in half, with the halves stacked on top of each other, on top of a digital scale, and weighing 973.5 grams.

f.   I saw a picture dated May 30, 2020, of white powdery chunks on a paper plate.

g.   I saw a picture dated November 8, 2020, of a white powdery brick shaped object in a wrapping consistent with kilogram narcotics packaging.

h.   I saw a picture of Andy's 2020 Tax filing, in which Andy claimed $132,900 combined business income plus self-employment gross income.

i.   I saw a video dated March 15, 2021, of Andy using a rolled-up dollar bill to snort a line of white powder off of the backside of a woman's bare bottom.

j.   I saw a picture dated July 8, 2021, of a wooden kilogram press and a money counter on a wooden table.

k.   I saw a screenshot dated August 7, 2021, of a text message conversation between Andy and "Manny," in which "Manny" asks Andy to bring some "blow," slang for cocaine, and Andy replies "Yes."

l.   I saw a picture dated August 7, 2021, of an unidentified male appearing to snort a line of white powder off of a woman's bare behind.

m.   I saw a picture dated September 10, 2021, of a white powdery brick shaped object stamped with the letters "HH" on top of a granite countertop.  Based on my training and experience, I know that drug traffickers often stamp kilogram blocks of cocaine with shapes and letters as a trademark for their particular product, as well as to show that the cocaine is pure.

n.   I saw a picture dated December 6, 2021, of a white powdery brick shaped object stamped with "TUCAN" on top of a digital scale.

o.   I saw a picture dated September 3, 2021, of Andy's Louis Vuitton backpack filled with bundles of cash.  I recognized this backpack as the backpack seized from Andy on March 23, 2022.

p.   I saw a picture dated March 21, 2022, of a Carfax vehicle value for SUBJECT VEHICLE 1.  I recognized this vehicle from surveillance on May 13, 2022, in which I saw SUBJECT VEHICLE 1 parked on the street in front of SUBJECT PREMISES 3.

q.   I saw a video, with a date that I do not recall, of Andy sitting on a couch counting a large amount of cash and yelling at his child in the background.  I believe that this video was taken inside SUBJECT PREMISES 2 because his phone also contained videos taken from a Ring surveillance camera inside the home with the same layout, and we conducted surveillance at SUBJECT PREMISES 2 showing a Ring camera on the outside of the home.  The phone also contained videos from the Ring camera on the outside of the home, which agents recognize from surveillance as SUBJECT PREMISES 2.

r.   I saw an Instagram messaging application conversation between Andy and user ID 28174748267, in which Andy is asked how much he paid for the "GLE."  Andy stated he paid "100,500" and "Whole sale was 101 on it."  Andy also stated "4,700 miles."  Vehicle registration data showed that SUBJECT VEHICLE 1 was registered on April 14, 2022, and the odometer reading was 4,602 miles.  Based on my training and experience, I know that drug traffickers often register vehicles in friends or families' names to avoid detection and to thwart law enforcement efforts to seize property used in furtherance of drug trafficking activities.  As detailed above, Andy seemed to use this method of concealment after the seizure of the 2021 Cadillac Escalade seized during the traffic stop on March 23,

2022.  Through California DMV document inquiries, I discovered that Andy was listed on the original release of liability filed by Eric Sassenberg.  I also discovered that Andy's father, Antonio, registered the Cadillac Escalade in his name on March 26, 2022.  I noticed that Antonio filed missing title paperwork and bill of sale with what appeared to be a forged signature.  I the document was forged based on a comparison of Sassenberg's California driver's license signature, as well as asking Sassenberg if he signed any bill of sale or missing title paperwork.  Based on my training and experience, Antonio used this method to hide the original title with Andy's name on it in order to get the vehicle in Antonio's name and out of Andy's name.

### D.   Surveillance and Records Checks

55.  SA Rodriguez did drive-by surveillance on SUBJECT PREMISES 2, on April 12, 2022.  SA Rodriguez saw SUBJECT VEHICLE 7, registered to Andy, parked in the driveway of SUBJECT PREMISES 2.

56.  We also did open-source records searches related to SUBJET PREMISES 2.  The records showed that Experian reported on March 11, 2022, that Andy lived at SUBJECT PREMISES 2.  In my experience, Experian will report such an association when a person applies for credit using an address or applies for utilities at an address.

57.  We also searched license-plate reader databases for the white Cadillac in which Andy was arrested.  As stated above, the databases showed that the white Cadillac traveled around

Sierra Lakes Parkway, near SUBJECT PREMISES 2, on March 21 and 22, 2022.

58.   On May 13, 2022, DEA Investigators preformed surveillance at SUBJECT PREMISES 3, a house Andy told investigators was his parent's house, and SUBJECT PREMISES 2, the address that Andy listed as belonging to Anthony on Andy's rental application.

a.   At approximately 10:12 a.m., I saw SUBJECT VEHICLE 3 pull into the driveway of SUBJECT PREMISES 3. I saw an unidentified male wearing a black shirt open the trunk of SUBJECT VEHICLE 3 and carry a large bag duffel bag into SUBJECT PREMISES 3. I saw the unidentified male left the trunk of the SUBJECT VEHICLE 3 open.

b.   At approximately 10:28 a.m., I saw Antonio and an unidentified Hispanic female exit SUBJECT PREMISES 3. I was able to identify the unidentified female as Maria based on California driver's license photo records. I saw Antonio close the trunk of SUBJECT VEHICLE 3. I then saw Maria get into the driver side front seat of SUBJECT VEHICLE 4. I saw Antonio get into the passenger side front seat of SUBJECT VEHICLE 4. I saw SUBJECT VEHICLE 4 back out of the driveway and drive away from SUBJECT PREMISES 3.

c.   At approximately 11:13 a.m., I saw SUBJECT VEHICLE 4 return to SUBJECT PREMISES 3 and stop in the street in front of the driveway. I saw Antonio get out of the passenger side front seat and walk to SUBJECT VEHICLE 3. I saw SUBJECT VEHICLE 4 drive away from SUBJECT PREMISES 3 after dropping

Antonio.  I saw Antonio open the passenger side front door of SUBJECT VEHICLE 3 and look around the interior of the car.  I saw Antonio close the passenger side front door and open the trunk of SUBJECT VEHICLE 3.  I saw Antonio pull out a large black duffel bag from the trunk of SUBJECT VEHICLE 3 and reach inside the bag.  I saw Antonio pull out a black cell phone from the bag, place the bag back in the trunk, and walk into SUBJECT PREMISES 3 with the trunk still open.

       d.   At approximately 11:34 a.m., I saw Antonio exit SUBJECT PREMISES 3 and pull a small black bag from the trunk of SUBJECT VEHICLE 3.  I saw Antonio CERVANTES take power tools from the garage of SUBJECT PREMISES 3 and place them into the trailer of SUBJECT VEHICLE 6 parked on the street in front of SUBJECT PREMISES 3.  I saw Antonio get into the driver side front seat of SUBJECT VEHICLE 6 and back the trailer into the driveway of SUBJECT PREMISES 3.  I saw Antonio loading various cleaning supplies in the trailer.

       e.   At approximately 11:47 a.m., I saw Antonio get into the driver side front seat of SUBJECT VEHICLE 6 and drive away from SUBJECT PREMISES 3.

       f.   At approximately 12:00 p.m., I saw SUBJECT VEHICLE 2 park in the street in front of the residence.  I saw Anthony Cervantes get out of the driver side front seat of SUBJECT VEHICLE 2 and walk into SUBJECT PREMISES 3.

       g.   At approximately 12:05 p.m., I saw Anthony Cervantes exit SUBJECT PREMISES 3 and get back into the driver side front seat of SUBJECT VEHICLE 2.  I saw Anthony leave

SUBJECT PREMISES 3.  Investigators maintained continuous mobile surveillance on SUBJECT VEHICLE 2.

h.   At approximately 12:07 p.m., SA Marco Garza saw SUBJECT VEHICLE 2 pull into the child pick up line at Belvedere Elementary School located at 2501 Marshall Boulevard, Highland, California 92346.

i.   At approximately 12:11 p.m., SA Garza saw SUBJECT VEHICLE 2 leave Belvedere Elementary School.  Investigators maintained continuous mobile surveillance on SUBJECT VEHICLE 2.

j.   At approximately 12:50 p.m., I saw SUBJECT VEHICLE 2 pull into and park at Walmart located at 2050 West Redlands Boulevard, Redlands, California 92373.  I saw Anthony walk into the Walmart carrying a child.

k.   At approximately 1:00 p.m., I saw Anthony exit Walmart with a shopping cart and walk to SUBJECT VEHCILE 2.  I saw Anthony place his child in the driver side rear seat and then place items from the cart in the same location.  DEA Airwing saw SUBJECT VEHICLE 2 leave the Walmart and maintained continuous mobile surveillance on SUBJECT VEHICLE 2.

l.   At approximately 1:13 p.m., DEA Airwing saw SUBJECT VEHICLE 2 park at the Raintree Apartments located at 26636 9th Street, Highland, California.

m.   At approximately 1:14 p.m., DEA Airwing saw an unidentified male get into the passenger front seat of SUBJECT VEHICLE 2.

n.   At approximately 1:15 p.m., DEA Airwing saw the unidentified male get out of the passenger front seat of SUBJECT

VEHICLE 2.  Based on my training and experience, drug traffickers making drug transactions often do the transactions in their vehicles, with the drug purchaser getting into the vehicle and getting out in a short period of time.  DEA Airwing saw SUBJECT VEHICLE 2 leave the apartment complex and maintained continuous mobile surveillance on the vehicle.

o.   At approximately 1:22 p.m., DEA Airwing saw SUBJECT VEHICLE 2 pull into The Crossings at Redlands apartments located at 26000 West Lugonia Avenue, Redlands, California 92374 (the complex containing SUBJECT PREMISES 1).  DEA Airwing saw Anthony park near apartment building number four and walk to the apartment building.

p.   At approximately 1:31 p.m., SA Garza saw Anthony exit the apartment building and open the driver's side of SUBJECT VEHICLE 2.  SA Garza saw Anthony walk to a white Infiniti sedan.  SA Garza saw Anthony pass something small through the driver side front window to the driver of the Infiniti.  Based on my training and experience, drug traffickers often do drug transactions in vehicles by either getting in the vehicle or passing drugs and money through the window of the vehicle.  SA Garza saw the Infiniti leave the apartment complex and Anthony walk back into the apartment building.

q.   At approximately 3:01 p.m., surveillance was terminated.

59.  Finally, we did California DMV registration checks that showed all of the registration information for the SUBJECT VEHICLES contained in Paragraph 4 above.

29

## TRAINING AND EXPERIENCE ON DRUG OFFENSES

50.  As a result of my law enforcement training and experience in narcotics and money laundering investigations, I have developed a detailed understanding of narcotics conspiracies and related illegal activities by criminal DTOs and their associates.  Such understanding is detailed in the following paragraphs.

51.  Narcotics conspiracies and the distribution of narcotics and controlled substances are frequently continuing criminal enterprises which span over months, and often, years. Narcotics traffickers, especially those connected to international DTOs, who appear to have access to large quantities of opioids like fentanyl typically will obtain and distribute narcotics and controlled substances on a regular basis, like any distributor of a legitimate commodity would purchase inventory for sale.  Such narcotics traffickers will have an "inventory" which will fluctuate in size depending on the demand for the product.

52.  Traffickers commonly maintain those items described in Attachment B, including records relating to the manufacture, transportation, ordering, sale, and distribution of illegal narcotics and controlled substances.  For instance, traffickers commonly employ a consignment system where they "front" illegal narcotics and controlled substances to their customers and thus keep some type of records concerning monies owed and payments made.  The records are often maintained where the trafficker in illegal narcotics and controlled substances has ready access to

30

them, or where the trafficker believes the records would be safe, such as the trafficker's residence, places of business, and/or vehicles, as well as locations from which the drug trafficker conducts drug transactions.  The records are often maintained in secure and concealed locations as to hide them from not only law enforcement but unwitting members of the household.  In addition, I understand that the case law in the Ninth Circuit establishes a general presumption that individuals involved in drug trafficking conspiracies, including their assistants, maintain evidence of these crimes in their residences.[6]  Typically, these records are kept whether or not the narcotics trafficker is in actual possession of narcotics or illegal controlled substances at any given moment.  In my experience, the records maintained by narcotics traffickers include: Drug, money, and other types of ledgers; sheets showing payments and debts called "pay/owe sheets"; Distributor, supplier, and customer lists; Correspondence, books, logs, receipts, journals and other documents noting drug prices and quantities, and/or the times where narcotics and controlled substances were obtained, transferred, sold, distributed, and/or concealed; photographs, videos, and other depictions of

---

[6]  See, e.g., United States v. Fannin, 817 F.2d 1379, 1382 (9th Cir. 1987) ("[E]vidence discovered by [] officers linking the defendants to a drug scheme provide[s] 'more than a sufficient showing for obtaining the warrant to search [their] . . . residence.'" (interal quotation marks and citation omitted)); United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986) ("In the case of drug dealers, evidence is likely to be found where the dealers live."; "When the traffickers consist of a ringleader and assistants, a fair probability exists that drugs will be present at the assistants' residence as well as the ringleader's." (citations omitted)).

narcotics and controlled substances; leases and rental agreements, escrow documents, utility bills, telephone bills, loan payment receipts, rent receipts, trust deeds, vehicle title documents, automobile registration records, keys, and other indicia of ownership and occupancy over residences, businesses, and vehicles used for the storage of narcotics and narcotics proceeds; airline tickets, itineraries, and/or shipping information relating to the transportation of narcotics and controlled substances.

53.  It is common for narcotics traffickers to secrete contraband, records of drug transactions, large amounts of currency (currency in amounts of $1,000 or more), financial instruments, precious metals, jewelry, automobile titles, other items of value and/or proceeds of drug transactions, and evidence of financial transactions relating to obtaining, transferring, secreting, or spending large sums of money acquired from engaging in narcotics trafficking activities in secure locations in their residences or the curtilage of their residences (including in garages and storage containers located on such premises), in their vehicles, and in their businesses for ready access and to conceal them from law enforcement as well as unwitting members of the household.

54.  Since drug trafficking is an ongoing criminal enterprise, narcotics traffickers typically will keep records associated with their narcotics activities for an extended period of time, especially since such records are vital to the orderly operation of a narcotics enterprise.  Indeed, I have

observed that many narcotics traffickers (even including more sophisticated ones) oftentimes are unaware or are less sensitive to the fact that these records generally can provide substantial circumstantial evidence of large-volume narcotics sales. Because possession of the documents themselves, unlike possession of narcotics, is not illegal, narcotics traffickers often fail to take precautions to destroy the documentation. Therefore, documentation may survive for many months, sometimes years, after a large volume drug transaction has occurred, often in the traffickers' residences and vehicles.  Such documentation may be in hard copy form or stored in digital devices such as cell telephones and other mobile communication devices.

55.  Narcotics traffickers often keep on hand large amounts of United States currency in order to maintain and finance their ongoing drug businesses, which operate on a cash basis.  This cash is typically stored in various locations, including the traffickers' residences, places of business, and the residences of their close associates, as well as in automobiles, storage lockers, safes, and safety deposit boxes.

56.  When traffickers amass large quantities of cash from the sale of narcotics, they often attempt to legitimize these profits through the use of foreign and domestic banks and financial institutions and their attendant services that include false and fictitious business records and accounts, securities, cashier's checks, money orders, wire transfers, stock certificates, bonds, certificates of deposit, brokerage house documents, real estate corporations, business fronts, and safe

deposit boxes.  As a result, business records and financial instruments are often found in locations where traffickers store other records of their narcotics activities.

57.  Narcotics traffickers often use cellular telephones and other communication devices sometimes in fictitious and/or other individual's names, such as in this investigation. Traffickers commonly receive telephone calls and voicemail messages from individuals seeking to conduct narcotics transactions.  As a result, traffickers often maintain in their residences, vehicles, and locations where they conduct transactions, records and items that reflect or contain names, addresses, and/or telephone numbers for their associates and co-conspirators in the drug trafficking organization.  These records and items include telephone address books and telephone listings, text messages, voice mails, as well as letters, telephone bills, e-mails, and personal notes reflecting names, identities, addresses, and telephone numbers.  Traffickers often keep records and evidence of their illegal activities for a period of time extending beyond during which they actually possessed illegal narcotics and controlled substances, in order to maintain contact with their criminal associates for future drug transactions, and so that they can have records of prior transactions for which a trafficker might still be owed money, or might owe someone else money.

58.  Narcotics traffickers often take or cause to be taken photographs of themselves, their associates, their property, and

their products, and these traffickers usually maintain these photographs in their residences, vehicles, and/or businesses.

59.  Narcotics traffickers often drive different vehicles to avoid being identified as driving one particular vehicle with an identifiable license plate in order to thwart investigation of their illegal activities, and the vehicles which narcotics traffickers use to transport narcotics and controlled substances contain traces or physical evidence of narcotics controlled substances, large amounts of cash earned from illegal drug transactions, concealed weapons, and communication devices such as cell phones, smart phone, or blackberries.

60.  Narcotics traffickers commonly use handguns and other firearms to protect themselves, their contraband, and the proceeds from their drug trafficking activities.  Narcotics traffickers commonly use coded language to refer to narcotics operations and along the same lines, narcotics traffickers commonly change phone numbers to avoid detection by law enforcement.

61.  Narcotics traffickers commonly use hidden compartments when transporting narcotics and or narcotics proceeds in vehicles.  It is common for narcotics traffickers to use natural voids in vehicles or manufactured locations known as "traps" in order to thwart the detection of law enforcement.

## <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>[7]

60. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

---

[7] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

61.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data
during a search of the premises for a number of reasons,
including the following:

a.   Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.  Also, there are now so
many types of digital devices and programs that it is difficult
to bring to a search site all of the specialized manuals,
equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

62.   The search warrant requests authorization to use the
biometric unlock features of a device, based on the following,
which I know from my training, experience, and review of
publicly available materials:

a.   Users may enable a biometric unlock function on
some digital devices.  To use this function, a user generally
displays a physical feature, such as a fingerprint, face, or
eye, and the device will automatically unlock if that physical
feature matches one the user has stored on the device.  To
unlock a device enabled with a fingerprint unlock function, a
user places one or more of the user's fingers on a device's
fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

63. In some circumstances, fingerprint sensors will not work, and a passcode must be entered to unlock the device. For example, with Apple, Touch ID will not work if (1) more than 48 hours have passed since the device has been unlocked, (2) the device has been turned on or restarted, (3) the device has received a remote lock command, or (4) five attempts to match a fingerprint have been unsuccessful. Other brands have similar restrictions. I do not know the passcodes of the devices likely to be found at the SUBJECT PREMISES and the SUBJECT VEHICLES.

64. For these reasons, while executing the warrant, agents will likely need to use the fingerprints or thumbprints of any user(s) of any fingerprint sensor-enabled device(s) to attempt to gain access to that device while executing the search warrant. The warrant seeks the authority to compel the use of the fingerprint and/or thumbprint of every person who is located at the SUBJECT PREMISES and the SUBJECT VEHICLES during the

execution of the search and who is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the SUBJECT PREMISES and the SUBJECT VEHICLES and falls within the scope of the warrant.  The government may not be able to obtain the contents of the devices if those fingerprints are not used to access the devices by depressing them against the fingerprint sensor at the time of the search. Although I do not know which of the fingers are authorized to access on any given device, I know based on my training and experience that it is common for people to use one of their thumbs or index fingers for fingerprint sensors, and in any event all that would result from successive failed attempts is the requirement to use the authorized passcode or password.

65.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

40

## <u>CONCLUSION</u>

66.   For all of the reasons described above, there is probable cause to believe that evidence, fruits, or instrumentalities of the Subject Offenses will be found at the SUBJECT PREMISES and in the SUBJECT VEHICLES.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this  26th day of May,
2022.

_____
HON. SHERI PYM
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A-1**

**PREMISES TO BE SEARCHED**

The premises to be searched are as follows: apartment 4423, located at 26000 West Lugonia Avenue, Redlands, California 92374 ("SUBJECT PREMISES 1") located in building 4 on the northwest side of the four-story apartment complex.

The places to be searched includes (a) all rooms, porches, containers, and safes in SUBJECT PREMISES 1; and (b) any carports, storage spaces, or other outbuildings assigned to SUBJECT PREMISES 1; (c) any vehicles parked in any carports or parking spots assigned to SUBJECT PREMISES 1; and (d) any digital devices found at SUBJECT PREMISES 1.

**ATTACHMENT B**

I. **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute controlled substances), and 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), namely:

a.   Any controlled substance, controlled substance analogue, or listed chemical;

b.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances, including scales and other weighing devices, plastic baggies, food saver sealing devices, heat sealing devices, balloons, packaging materials, containers, and money counters;

c.   Firearms, ammunition, and firearm parts;

d.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

e.   United States currency over $1,000 or bearer instruments worth over $1,000 (including cashier's checks, traveler's checks, certificates of deposit, stock certificates, and bonds) (including the first $1,000), and data, records, documents, or information (including electronic mail, messages over applications and social media, and photographs) pertaining to, obtaining, possessing, using, applications for, or

transferring money over $1,000, such as bank account records, cryptocurrency records and accounts;

      f.   Jewelry, precious metals, or other items of value constituting evidence of unexplained wealth;

      g.   Any records, documents, programs, applications, or materials reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items commonly obtained with the proceeds of drug trafficking activities;

      h.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

      i.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

      j.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to

show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violations;

k.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violations;

l.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

m.   Contents of any calendar or date book;

n.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

o.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

p.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents,

iii

browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

  ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

  iii. evidence of the attachment of other devices;

  iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

  v. evidence of the times the device was used;

  vi. passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

  vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

  viii. records of or information about Internet Protocol addresses used by the device;

  ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

II. <u>**SEARCH PROCEDURE FOR DIGITAL DEVICE(S)**</u>

4.   In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or

seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or

evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling

outside the scope of the items to be seized absent further order of the Court.

     5.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

         a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

         b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

         c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

         d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

         e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

         f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

         g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

     6.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel

assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

1.   During the execution of this search warrant, law enforcement is permitted to: (1) depress the thumb and/or fingers every person who is located at the SUBJECT PREMISES and the SUBJECT VEHICLES during the execution of the search and who is reasonably believed by law enforcement to be a user of a fingerprint sensor-enabled device that is located at the SUBJECT PREMISES and the SUBJECT VEHICLES and falls within the scope of the warrant onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of the face of every person who is located at the SUBJECT PREMISES and the SUBJECT VEHICLES during the execution of the search and who is reasonably believed by law enforcement to be a user of a device with a facial-, iris-, or retina-recognition feature that is located at the SUBJECT PREMISES and the SUBJECT VEHICLES and falls within the scope of the warrant, with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a

person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

7.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

Exhibit 1

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means (USAO Rev. 12/20)

# UNITED STATES DISTRICT COURT
### for the
Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | **FILED**<br>CLERK, U.S. DISTRICT COURT<br><br>4/12/2022<br><br>CENTRAL DISTRICT OF CALIFORNIA<br>BY: ___KC___ DEPUTY |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | |
| | ) | Case No. 5:22-MJ-00223 |
| Digital devices seized from Andy Cervantes | ) | |
| Sanchez currently in the custody of the Drug | ) | |
| Enforcement Administration in Riverside, CA | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b), and 846 | See attached affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

_____
/S/
*Applicant's signature*

DEA Special Agent Dante Rene Matthews
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: April 12, 2022

_____
*Judge's signature*

City and state: Riverside, CA

Honorable Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: John A. Balla (x6246)

## **AFFIDAVIT**

I, Dante Rene Matthews, being duly sworn, declare and state as follows:

### I. **PURPOSES OF AFFIDAVIT**

1.    This affidavit is made in support of an application for a warrant to search the following digital devices seized from Andy CERVANTES Sanchez ("CERVANTES Sanchez") currently in the custody of the Drug Enforcement Administration ("DEA") in Riverside, California (collectively, the "SUBJECT DEVICES"):

a.    an Apple iPhone 7, bearing serial number 354910094644335 ("SUBJECT DEVICE 1"); and

b.    an Apple iPhone 11, bearing serial number 352840115802913 ("SUBJECT DEVICE 2").

2.    The SUBJECT DEVICES are described more fully in Attachment A, which is incorporated herein by reference.  The warrant seeks to search the SUBJECT DEVICES for evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute, or distribution of, a controlled substance), 843(b) (use of communication facility to commit drug offense), and 846 (conspiracy to possess with intent to distribute, or distribute, a controlled substance) (collectively, the "Subject Offenses"), as described more fully in Attachment B, which is also incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants arrest warrants, and criminal complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

4.    I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered to conduct investigations of, and to make arrests for, federal felony offenses enumerated in 18 U.S.C. § 2516.

5.    I am a Special Agent ("SA") of the DEA and have been so employed since September 2020.  I am currently assigned to the Los Angeles Field Division, Riverside District Office, in Riverside, California, and my responsibilities include investigating large-scale drug trafficking organizations operating in the Southern California area and elsewhere.

6.    I attended the DEA fourteen-week training academy located in Quantico, Virginia.  While at the DEA training academy, I received formal training in investigative techniques, drug identification, and the laws pertaining to drug investigations.  I have received on-the-job training from supervisors, and other agents regarding the illegal trafficking of controlled substances.  Before working for the DEA, I was employed as a Border Patrol Agent, where I attended a twenty-week training academy at the Federal Law Enforcement Training

Center in Artesia, New Mexico, and then assigned to the Tucson
Sector, Ajo Border Patrol Station, for two years.

7.     By virtue of my employment as a Federal Agent, I have
participated in drug investigations, which have included the use
of confidential sources and undercover officers, physical
surveillance, electronic surveillance, the execution of search
and arrest warrants, telephone toll analysis, the arrests of
drug traffickers, and the analysis of seized records, physical
evidence, and taped conversations.  Over the course of my
employment as a law enforcement officer, I have participated in
investigations that involve one or all of the following crimes:
possession, distribution, possession with intent to distribute,
and manufacture of controlled substances; and international
human and drug smuggling.  I have assisted in the execution of
multiple search warrants and have spoken with defendants,
confidential informants, and other witnesses who have extensive
knowledge of large-scale narcotics trafficking organizations.
In addition, I have spoken with other experienced narcotics
investigators concerning the methods and practices of drug
traffickers.

8.     Based on my training and experience, my conversations
with other law enforcement personnel, and my own participation
in this investigation, I have become familiar with the criminal
activities of individuals involved in drug trafficking
organizations, including drug manufacturing, drug distribution,
and money laundering.  I am also aware of the tactics and
methods employed by such individuals to avoid detection by law

enforcement, including the use of multiple wireless telephones, pre-paid cellular telephones, cloned communication devices, debit calling cards, public pay telephones, counter-surveillance techniques, false or fictitious identities, coded and ambiguous language in conversations, multiple vehicles, and vehicles with concealed compartments.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.    CHP Officers Conduct a Traffic Stop on CERVANTES Sanchez**

9.    On March 23, 2022, at approximately 4:15 p.m., California Highway Patrol ("CHP") Officer R. Valadez was driving a fully marked CHP patrol vehicle, in full CHP uniform, southbound on Arden Avenue approaching Date Street in Highland, California.  Officer Valadez saw a white Cadillac Escalade SUV, bearing California License Plate 8ZVD040 traveling northbound on Arden Avenue at a high rate of speed.  Officer Valadez visually estimated the Cadillac's speed to be approximately 60 MPH. Officer Valadez activated his front radar unit and saw that the unit gauged the Cadillac's speed to be 56 MPH in a 35 MPH zone. Officer Valadez allowed the Cadillac to pass his patrol vehicle and made a U-turn to position his patrol vehicle behind the Cadillac before activating his police lights and siren to stop the Cadillac.

10.   The Cadillac pulled over to the curb and parked on Arden Avenue, just south of Lynwood Drive.  Officer Valadez conducted a DMV check on the Cadillac, which revealed that the

registered owner of the Cadillac was Eric Sassenberg from Huntington Beach, California.

11.   Officer Valadez contacted the driver of the Cadillac, later identified as CERVANTES Sanchez, through the open passenger window of the Cadillac, and was overwhelmed by the smell of marijuana.  Officer Valadez also saw a female passenger in the front passenger seat.  Officer Valadez found it odd that the smell of marijuana was so strong considering the fact that both front windows were rolled down.  Officer Valadez informed CERVANTES Sanchez of the reason for the stop and asked for CERVANTES Sanchez's driver license, registration, and insurance card.  CERVANTES Sanchez could not provide the requested documentation, stating that his father just bought the Cadillac yesterday, March 22, 2022.  Officer Valadez asked CERVANTES Sanchez about his license, and during the interaction, could still smell the marijuana odor.

12.   CERVANTES Sanchez stated that he was not in possession of the license, but he knew his California Driver's License number.  Officer Valadez asked CERVANTES Sanchez about the marijuana odor and asked if he was in possession of any marijuana.  CERVANTES Sanchez stated that his father smokes marijuana and probably smoked in the Cadillac recently.  Officer Valadez told CERVANTES Sanchez that, due to the odor of marijuana, Officer Valadez was going to have CERVANTES Sanchez exit the Cadillac to conduct a preliminary eye exam to determine if he should follow up with a full DUI investigation.  CERVANTES Sanchez agreed and exited the Cadillac.  Officer Valadez and

CERVANTES Sanchez walked to the right front of Officer Valadez's patrol vehicle where Officer Valadez conducted an eye exam on CERVANTES Sanchez's right eye.  Officer Valadez saw that CERVANTES Sanchez's right eye did not display horizontal gaze nystagmus.  However, due to the marijuana odor, Officer Valadez also checked for lack of convergence to determine if CERVANTES Sanchez was under the influence of marijuana.  Officer Valadez saw that CERVANTES Sanchez's eyes did not display any lack of convergence.  CERVANTES Sanchez verbally identified himself by name and date of birth.  Officer Valadez conducted a driver's license check which revealed that CERVANTES Sanchez was issued a valid California Driver's License.  Officer Valadez positively identified CERVANTES Sanchez using CERVANTES Sanchez's driver's license photo.

13.  After Officer Valadez determined that CERVANTES Sanchez was not under the influence of alcohol or marijuana, Officer Valadez asked CERVANTES Sanchez about the odor of marijuana again and emphasized the strength of the smell. Officer Valadez asked if there was any marijuana in the Cadillac.  CERVANTES Sanchez said no and stated that his father smokes marijuana and it was probably from that.  Officer Valadez explained that the odor was overwhelming and fresh and that the odor could not be from smoking marijuana because the smell would be rancid and burnt.

14.  Officer Valadez asked CERVANTES Sanchez if Officer Valadez could look in the Cadillac and told CERVANTES Sanchez that it was not illegal to be in possession of a personal-use

amount.  CERVANTES Sanchez gave Officer Valadez consent by saying "yeah" and willingly opened the Cadillac's rear hatch. Once opened, CERVANTES Sanchez lifted the cover for a small cargo area.  Officer Valadez saw some tire changing tools and a cargo net.  CERVANTES Sanchez then walked to the rear left passenger door and opened it.  Officer Valadez walked to the rear right passenger door and asked CERVANTES Sanchez if he could open it.  With CERVANTES Sanchez's permission, Officer Valadez opened the door and saw a small child sleeping in the right rear passenger seat.  Officer Valadez observed that just below the child's feet on the right rear floorboard was a child's backpack.

15.   Officer Valadez saw a folded cardboard box leaning against a brown backpack in between the right rear and left rear passenger seats. Based on Officer Valadez's training and experience, the cardboard box appeared to be stood up against the backpack on purpose.  Officer Valadez saw CERVANTES Sanchez follow Officer Valadez's eyes to the backpack.  CERVANTES Sanchez stated that the backpack was empty.  CERVANTES Sanchez unzipped the backpack and reached inside stating the backpack was empty.  Due to officer safety, Officer Valadez moved to a position to take cover with his eyes still focused on the backpack and CERVANTES Sanchez's hands.  Officer Valadez asked CERVANTES Sanchez to remove his hand from inside the backpack. CERVANTES Sanchez complied, lifted the backpack by its strap, and handed it to Officer Valadez as he repeated that it was empty.  Officer Valadez took the backpack and looked inside the

unzipped area.  Officer Valadez saw a white plastic bag wrapped around a brick shaped kilogram sized package and loose U.S. currency.  Based on Officer Valadez's training and experience, the brick shaped kilogram sized package appeared to be a large quantity of a controlled substance.  Officers did not field test the substance because of the danger posed with possible fentanyl exposure.  DEA has taken custody of the substance and sent it to a laboratory for examination with the results still pending.  I have examined photos of the substance, and I believe, based on my training and experience, that the substance is cocaine.  The substance weighed just over 1 kilogram.

16.  Officer Valadez, acting as if he did not see anything out of the ordinary, calmly handed the backpack to CERVANTES Sanchez and asked CERVANTES Sanchez to come back to the patrol vehicle so Officer Valadez could complete the citation for speeding.  Once back at the patrol vehicle, Officer Valadez distracted CERVANTES Sanchez momentarily and requested back up.  As Officer Valadez waited for back up, San Bernardino County Sheriff's Deputies C. Veit and J. Desario offered Officer Valadez assistance with the stop until CHP back up arrived.  Officer Valadez handcuffed CERVANTES Sanchez and placed him in the right rear of the patrol vehicle.  Officer Valadez advised CERVANTES Sanchez that he was being detained and not under arrest.  Officer Valadez re-approached the Cadillac and asked the right front passenger, Angelica Cervantes, to exit the Cadillac and detained her.  Officer Valadez, Deputy Veit, and Deputy Desario preformed a safety sweep of the SUBJECT VEHICLE

8

to make sure there were no more passengers in the vehicle. Officer Valadez left the child sleeping in the right rear passenger seat for the duration of the contact with Angelica Cervantes.  After performing the safety sweep, Officer Valadez took possession of the backpack and opened it to confirm the contents in the presence of Deputies Veit and Desario.  Officer Valadez unwrapped the plastic bag from around the brick-shaped, kilogram-sized package and saw a large yellow sticker with "ZZZ" in black lettering on it and a large orange sticker with "Cartier" printed on it (consistent, in my training and experience, with the kinds of labels that drug traffickers will apply to their product).  Officer Valadez moved the plastic bag and saw a large amount of U.S. currency in denominations of hundreds, fifties, and twenties.

17.   Officer Valadez walked back to the patrol vehicle and told Angelica Cervantes the reason for the detention.  Officer Valadez informed Angelica Cervantes that she was not under arrest but that Officer Valadez wanted to know about the backpack and if it belonged to her.  Officer Valadez asked Angelica Cervantes about the backpack and if she was aware of its contents.  Angelica Cervantes stated she and CERVANTES Sanchez use the backpack as a diaper bag for their child. Angelica Cervantes stated that she had not seen the backpack for about a month.  Angelica Cervantes stated that the backpack has been in CERVANTES Sanchez's possession and that was the reason she was now using the children's backpack as a diaper bag. Officer Valadez asked Angelica Cervantes where they were coming

9

from.  Angelica Cervantes stated that she and her child were
picked up at her residence in Colton by CERVANTES Sanchez and
were on their way to CERVANTES Sanchez's house to get food.
Angelica Cervantes stated that she was not aware the backpack
was in the Cadillac.  Officer Valadez released Angelica
Cervantes from detention and allowed her and her child to leave
the scene with her family members.

18.   Officer Valadez placed CERVANTES Sanchez under arrest
at approximately 5:05 p.m. for violating California Health and
Safety Code Section 11378, possession of a controlled substance
for sales.  Officers searched the Cadillac and found SUBJECT
DEVICE 1 in the center console.  Officers searched CERVANTES
Sanchez incident to arrest and found SUBJECT DEVICE 2 in his
front pants pocket.

19.   Officer Valadez read CERVANTES Sanchez his <u>Miranda</u>
rights at approximately 5:30 p.m.  Officer Valadez asked
CERVANTES Sanchez if he understood his rights.  CERVANTES
Sanchez said "yeah."  Officer Valadez asked CERVANTES Sanchez if
he was willing to talk about the contents of the backpack.
CERVANTES Sanchez again said "yeah."  Officer Valadez asked
CERVANTES Sanchez if the backpack was his.  CERVANTES Sanchez
said yes and stated that his father asked if he could use the
bag for a trip his father took to Fresno.  CERVANTES Sanchez
stated that his father returned from the business trip a few
days earlier and must have left the bag in the Cadillac.
CERVANTES Sanchez stated that he went to his parents' house on
Val Mar Circle, Highland, California, and asked if he could use

10

the Cadillac to pick up Angelica Cervantes and their child to go
and eat.

20.   Officer Valadez asked about CERVANTES Sanchez's
statements that the Cadillac was purchased the day before and
that his father took a business trip in the Cadillac.  CERVANTES
Sanchez stammered a bit and stated that the Cadillac was
purchased a few days ago.  Officer Valadez asked again if the
backpack was in the Cadillac at the time CERVANTES Sanchez
picked the Cadillac up from his father and if his father left
the backpack in the Cadillac.  CERVANTES Sanchez stated he was
not sure if his father left the backpack in the Cadillac, but
whatever was inside the backpack did not belong to CERVANTES
Sanchez.

21.   At approximately 5:56 p.m., CHP Officer J. J.
Rodriguez arrived to assist Officer Valadez.  Officer Rodriguez
began speaking to CERVANTES Sanchez as he was seated in the back
of the patrol vehicle.  Officer Rodriguez asked CERVANTES
Sanchez if he was advised of his <u>Miranda</u> rights, and CERVANYTES
Sanchez stated that he was.  Officer Rodriguez asked CERVANTES
Sanchez if he understood his rights, and CERVANTES Sanchez
stated that he understood and was willing to talk to Officer
Rodriguez.  CERVANTES Sanchez stated that he was recently in an
accident and needed a car to drive.  CERVANTES Sanchez stated
that he went to his parents' house to pick up the Cadillac.
CERVANTES Sanchez stated that everything was already in the
Cadillac when he picked it up.  CERVANTES Sanchez stated that he
drove the Cadillac to his uncle's tire shop, located at 7615

Sterling Avenue, San Bernardino, California, to put air in the tires. CERVANTES Sanchez stated he then drove to his "baby mama's" apartment in Grand Terrace. CERVANTES Sanchez stated that he did not know the address to her apartment. CERVANTES Sanchez stated he was heading back to his parents' house in Highland when he was pulled over. CERVANTES Sanchez stated his dad recently purchased the Cadillac after a business deal.

22. Based on the large amount of controlled substances and U.S. currency, Officer Rodriguez contacted DEA investigators to assist in the investigation. Officer Valadez transported CERVANTES Sanchez to the CHP San Bernardino Area Office for further investigation.

23. Once at the CHP San Bernardino Area Office, Officer Rodriguez spoke with CERVANTES Sanchez. CERVANTES Sanchez stated that when he picked up the Cadillac, he saw the backpack containing the money and drugs but did not know what was in it. CERVANTES Sanchez stated that he purchased the backpack two years earlier, but the contents of the backpack were not his. Officer Rodriguez asked CERVANTES Sanchez who would place drugs and money in the backpack. CERVANTES Sanchez stated, "Honestly, I don't know." CERVANTES Sanchez stated the Cadillac was purchased a couple of day prior to the stop. CHP Officer Rodriguez asked CERVANTES Sanchez who bought the Cadillac. CERVANTES Sanchez stated, "Pretty sure my parents." CERVANTES Sanchez asked if he could get the backpack back because he paid $7,000 for it, but none of the contents were his.

**B.   DEA Investigators Interview CERVANTES Sanchez**

24.   Officer Valadez informed DEA TFO Callahan and me that Officer Valadez had read CERVANTEZ Sanchez his <u>Miranda</u> rights at approximately 5:30 p.m.  At approximately 8:37 p.m., TFO Callahan and I began interviewing CERVANTES Sanchez.  TFO Callahan asked CERVANTES Sanchez if he was read his <u>Miranda</u> rights and if he was still willing to answer questions.  CERVANTES Sanchez told investigators that he was read his <u>Miranda</u> rights and that he was still willing to answer questions.

25.   CERVANTES Sanchez stated that he currently owns a barber shop called The Nines Barber Shop, located at 1498A N Mt. Vernon Avenue, Colton, California.  CERVANTES Sanchez stated that he has a personal cellphone and a work cellphone.  CERVANTES Sanchez was shown two iPhones seized during the traffic stop and stated that SUBJECT DEVICE 2 with the phone number 909-677-8554 is his personal phone and SUBJECT DEVICE 1 was his business phone.  CERVANTES Sanchez stated that he did not know the phone number for SUBJECT DEVICE 1.  I later called the number 909-677-8554 and CERVANTES Sanchez's uncle answered.  His uncle stated that 909-677-8554 was the house phone number.  I found an Instagram page for The Nines Barber Shop and noticed a post soliciting hiring barbers, along with CERVANTES Sanchez's phone number 909-677-8554.

26.   CERVANTES Sanchez stated that on March 23, 2022, prior to being pulled over, Angelica Cervantes's vehicle displayed a check-engine light, which made her not want to drive it.

CERVANTES Sanchez stated that he asked his father to borrow his 2021 Cadillac SUV.  CERVANTES Sanchez stated that Angelica Cervantes dropped CERVANTES Sanchez off at his parents' home to pick up the Cadillac.  CERVANTES Sanchez stated that his father given the Cadillac either Sunday or Monday in lieu of payment from his contracting job in construction/roofing/taxes.  CERVANTES Sanchez stated that he did not know whether his father paid for the Cadillac or not.  CERVANTES Sanchez stated that his father told CERVANTES Sanchez to fill the Cadillac's tires with air.  CERVANTES Sanchez stated that it was his first time driving the Cadillac.

27.  CERVANTES Sanchez stated that he drove the Cadillac to a tire shop to get air in the tires on the way to pick up Angelica Cervantes and their two-year-old son.  CERVANTES Sanchez stated that he did not know the name of the tire shop that he stopped at, but he knew it was on Sterling Avenue in Highland, California.  I attempted to find the tire shop on a map and asked CERVANTES Sanchez where the tire shop was on Sterling Avenue.  CERVANTES Sanchez stated that the tire shop was at the corner of Sterling Avenue and E. Ninth Street.  I found Premier Tire Shop located at 7615 Sterling Avenue, Highland, California, and asked CERVANTES Sanchez if it was the tire shop where he stopped.  CERVANTES Sanchez stated that it was.  I asked CERVANTES Sanchez why he stopped at that tire shop instead of others.  CERVANTES Sanchez stated that the tire shop is owned by his uncle.

28.    CERVANTES Sanchez stated that after leaving the tire shop, he drove to Angelica Cervantes's apartment.  CERVANTES Sanchez stated that after picking up Angelica Cervantes and their son, CERVANTES Sanchez drove back to his parents' house to get something to eat.  CERVANTES Sanchez later stated that he was driving to his parents' house to trade the Cadillac SUV with his mother for a Cadillac CTS.  CERVANTES Sanchez stated that he did not want to borrow a big vehicle because gas prices were too high.

29.    CERVANTES Sanchez stated that when he was pulled over and asked about the odor of marijuana in the vehicle, CERVANTES Sanchez did not think anything of the smell.  CERVANTES Sanchez stated that he is used to the smell of marijuana from working at his barber shop.  CERVANTES Sanchez stated that everything in the vehicle was already in the Cadillac before he started driving it that day, except for a few items for his son. CERVANTES Sanchez stated that he showed the officer that there was nothing illegal in the Cadillac and that he saw the brown Louis Vuitton bag in the third row of seats behind his son. CERVANTES Sanchez stated that he grabbed the bag to show the officer there was nothing in it.  CERVANTES Sanchez stated that when he grabbed the bag, he opened it up to show the officer and handed it to Officer Valadez.  CERVANTES Sanchez stated that he saw Officer Valadez look in the bag and then handed the bag back to CERVANTES Sanchez.  CERVANTES Sanchez stated that the Louis Vuitton bag was his and that he got it for Father's Day a couple of years ago.  CERVANTES Sanchez stated that he paid

approximately $2,000, and Angelica Cervantes paid $2,000 for the bag which was approximately $4,000 in total.  CERVANTES Sanchez stated that he left the Louis Vuitton bag at his parents' house when he was living with them.  CERVANTES Sanchez stated that his father asked CERVANTES Sanchez if he could use CERVANTES Sanchez's bag.  CERVANTES Sanchez stated that he allowed his family members to use his Louis Vuitton bag.  CERVANTES Sanchez stated that the Louis Vuitton bag was his, but the bag was already in the car prior to borrowing it, and the contents of the Louis Vuitton bag were not his.

30.  We asked CERVANTES Sanchez if CERVANTES Sanchez would allow investigators to look through the SUBJECT DEVICES. CERVANTES Sanchez told investigators that he has personal things on his phones and stated, "my phones are just my phones."  We asked CERVANTES Sanchez to place his phones on airplane mode and handed CERVANTES Sanchez SUBJECT DEVICE 1.  TFO Callahan watched CERVANTES Sanchez swiping numbers in the phone and believed that CERVANTES Sanchez was trying to delete information in the phone. TFO Callahan took SUBJECT DEVICE 1 away from CERVANTES Sanchez.

31.  Later in the interview, I informed CERVANTES Sanchez that investigators were not interested in CERVANTES Sanchez's personal things on the phones, but that if investigators could see the messages between CERVANTES Sanchez and his family members, investigators could corroborate the information that CERVANTES Sanchez gave about borrowing the vehicle.  CERVANTES Sanchez agreed to show investigators messages between CERVANTES Sanchez and Angelica Cervantes.  I gave CERVANTES Sanchez

SUBJECT DEVICE 2, which he stated was his personal phone.
CERVANTES Sanchez did not allow investigators to read to
contents of the messages, but instead read a text message out
loud to investigators from Angelica Cervantes, in which she was
complaining about CERVANTES Sanchez not coming to pick her up.
CERVANTES Sanchez told investigators that the message was sent
at 3:30 p.m.  At the conclusion of the interview, investigators
seized the SUBJECT DEVICES.

> ### C.  DEA Learns of Other Evidence Corroborating CERVANTES Sanchez's Drug Trafficking

32.   DEA later discovered that Officer Valadez found a
receipt from the UPS Store located at 1040 S. Mt. Vernon Avenue,
Suite G, Colton, California, in CERVANTES Sanchez's right front
pocket.  The receipt was for one 8x8x8 box and was sold on March
23, 2022, at 3:18 p.m.  Investigators also found a receipt in
the center console of the Cadillac for Lysol Spray, a three-pack
of Lysol Wipes, and two red coolers sold on March 23, 2022, at
approximately 3:14 p.m., at Walmart located at 1120 S. Mt.
Vernon Avenue, Colton, California.

33.   On March 28, 2022, DEA performed an inventory search
of the Cadillac SUV after taking custody of the vehicle.  During
the inventory search, investigators found the above-referenced
can of Lysol Spray, a three-pack of Lysol Wipes, one 8x8x8 UPS
Store box, and two red coolers, all new with original packaging
and Walmart grocery bags in the third row of seats.  Based on my
training and experience, drug traffickers who use mail services
to transport their narcotics sometimes use insulated containers

to thwart detection of the narcotics.  Drug traffickers also
sometimes use scented cleaning products to mask the odor of
narcotics from drug detection K-9s.  CHP had discovered these
items during their own inventory search prior to towing.

    IV. **TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING**

    34.   Based on my training and experience and information
obtained from other law enforcement officers who investigate
drug trafficking, I know the following:

        c.   The distribution of drugs is a continuing
criminal activity that occurs over months, and often years.
Drug traffickers often maintain books, receipts, notes, ledgers,
bank records, and other records relating to the manufacture,
transportation, ordering, sale and distribution of illegal
drugs.  The aforementioned records are often maintained where
drug traffickers have ready access to them, such as on their
cell phones and other digital devices, including tablets, such
as iPads.

        d.   Drug traffickers use telephones, portable
cellular and digital telephones, pagers, and other communication
devices, sometimes in fictitious and/or other individuals'
names, and maintain in such devices telephone and other contact
information which reflects names, addresses, and/or telephone
numbers of their associates in the drug-trafficking
organization, as well as customers of their drug trafficking
business.

        e.   Drug traffickers often keep records of meetings
with associates, customers, and suppliers on their digital

devices, including in the form of calendar entries and location data, such as Global Positioning System ("GPS") information, other locational information, and identifying information about the trafficker and co-conspirators and the location of previous drug transactions or stash houses, and/or the identity or whereabouts of traffickers and co-conspirators involved in narcotics trafficking.

f.   Because drug traffickers usually continue to sell drugs to support themselves until they are arrested, their communications with various co-conspirators tend to be ongoing until their arrest.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to confirm that they are in possession of the drugs, boast about the drugs, or facilitate drug sales.  It is also common for drug traffickers to carry cellular telephones in order to remain in contact with drug suppliers or customers, to communicate with co-conspirators to facilitate drug trafficking, to coordinate the movements of the trafficker and various co-conspirators, and

to coordinate the amount of drugs trafficked, as well as payment amounts and methods.  It is common for drug traffickers to accept orders and payments for drugs prior to drugs being delivered, especially in the case of drugs being shipped using the Postal Service.  Accordingly, there is often a lag between the time drugs are ordered and paid for, and the time they are received by the purchaser.  Based on my training and experience, I know that the above-described information can be stored on digital devices carried by drug traffickers.

## V.  <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

35.  As used herein, the term "digital device" includes the SUBJECT DEVICES.

36.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

37.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

e.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

f.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

38.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

## VI. <u>CONCLUSION</u>

39.   For all of the reasons described above, there is probable cause that the fruits, evidence, or instrumentalities of the Subject Offenses described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>12th</u> day of April, 2022.

_____
HON. SHERI PYM
UNITED STATES MAGISTRATE JUDGE

## **ATTACHMENT A**

SUBJECT DEVICE TO BE SEARCHED

The following digital devices seized from Andy CERVANTES Sanchez on March 23, 2022:

      a.  An Apple iPhone 7, bearing serial number 354910094644335, currently in the custody of the Drug Enforcement Administration ("DEA") and stored under evidence number N-9 ("SUBJECT DEVICE 1"); and

      b.  an Apple iPhone 11, bearing serial number 352840115802913, currently in the custody of DEA and stored under evidence number N-12 ("SUBJECT DEVICE 2").

**ATTACHMENT B**

## II.  **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute, and distribution of, controlled substances), 843(b) (use of communication facility to commit a drug offense), and 846 (conspiracy to possess with intent to distribute, or distribute, a controlled substance) (collectively described as the "Subject Offenses"), namely:

a.    Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

c.    Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all

received or missed incoming calls concerning controlled
substances and/or money, assets or payments for said substances;

       d.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices concerning controlled substances and/or money, assets or
payments for said substances;

       e.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device
concerning controlled substances and/or money, assets or
payments for said substances;

       f.   Audio recordings, pictures, video recordings, or
still captured images related to the purchase, sale,
transportation, or distribution of drugs;

       g.   Contents of any calendar or date book;

       h.   Global Positioning System ("GPS") coordinates and
other information or records identifying travel routes,
destinations, origination points, and other locations; and

       i.   Any digital device which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the Subject Offenses, and forensic copies thereof.

j.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

III.  <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

2.    In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

k.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic images thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital devices and/or forensic images thereof beyond this 120-day period without obtaining an extension of time order from the Court.

l.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

m.  The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

n.  If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

o.  If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

p.  If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

q.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

r.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

3.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

s.   Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

t.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

u.   Any magnetic, electronic, or optical storage device capable of storing digital data;

v.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

w.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

x.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

y.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

4.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

Exhibit 1

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means (USAO Rev. 12/20)

# UNITED STATES DISTRICT COURT
## for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No. 5:22-MJ-00223 |
| Digital devices seized from Andy Cervantes | ) |
| Sanchez currently in the custody of the Drug | ) |
| Enforcement Administration in Riverside, CA | ) |
| | ) |
| | ) |

**FILED**
CLERK, U.S. DISTRICT COURT

4/12/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____KC_____ DEPUTY

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a)(1), 843(b), and 846 | See attached affidavit |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

_____/S/_____
*Applicant's signature*

DEA Special Agent Dante Rene Matthews
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: April 12, 2022

_____
*Judge's signature*

City and state: Riverside, CA

Honorable Sheri Pym, U.S. Magistrate Judge
*Printed name and title*

AUSA: John A. Balla (x6246)

## AFFIDAVIT

I, Dante Rene Matthews, being duly sworn, declare and state as follows:

## I.   PURPOSES OF AFFIDAVIT

1.    This affidavit is made in support of an application for a warrant to search the following digital devices seized from Andy CERVANTES Sanchez ("CERVANTES Sanchez") currently in the custody of the Drug Enforcement Administration ("DEA") in Riverside, California (collectively, the "SUBJECT DEVICES"):

a.    an Apple iPhone 7, bearing serial number 354910094644335 ("SUBJECT DEVICE 1"); and

b.    an Apple iPhone 11, bearing serial number 352840115802913 ("SUBJECT DEVICE 2").

2.    The SUBJECT DEVICES are described more fully in Attachment A, which is incorporated herein by reference.  The warrant seeks to search the SUBJECT DEVICES for evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (possession with intent to distribute, or distribution of, a controlled substance), 843(b) (use of communication facility to commit drug offense), and 846 (conspiracy to possess with intent to distribute, or distribute, a controlled substance) (collectively, the "Subject Offenses"), as described more fully in Attachment B, which is also incorporated herein by reference.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and

witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrants arrest warrants, and criminal complaint and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

4.    I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7). I am empowered to conduct investigations of, and to make arrests for, federal felony offenses enumerated in 18 U.S.C. § 2516.

5.    I am a Special Agent ("SA") of the DEA and have been so employed since September 2020.  I am currently assigned to the Los Angeles Field Division, Riverside District Office, in Riverside, California, and my responsibilities include investigating large-scale drug trafficking organizations operating in the Southern California area and elsewhere.

6.    I attended the DEA fourteen-week training academy located in Quantico, Virginia.  While at the DEA training academy, I received formal training in investigative techniques, drug identification, and the laws pertaining to drug investigations.  I have received on-the-job training from supervisors, and other agents regarding the illegal trafficking of controlled substances.  Before working for the DEA, I was employed as a Border Patrol Agent, where I attended a twenty-week training academy at the Federal Law Enforcement Training

Center in Artesia, New Mexico, and then assigned to the Tucson Sector, Ajo Border Patrol Station, for two years.

7.   By virtue of my employment as a Federal Agent, I have participated in drug investigations, which have included the use of confidential sources and undercover officers, physical surveillance, electronic surveillance, the execution of search and arrest warrants, telephone toll analysis, the arrests of drug traffickers, and the analysis of seized records, physical evidence, and taped conversations.  Over the course of my employment as a law enforcement officer, I have participated in investigations that involve one or all of the following crimes: possession, distribution, possession with intent to distribute, and manufacture of controlled substances; and international human and drug smuggling.  I have assisted in the execution of multiple search warrants and have spoken with defendants, confidential informants, and other witnesses who have extensive knowledge of large-scale narcotics trafficking organizations. In addition, I have spoken with other experienced narcotics investigators concerning the methods and practices of drug traffickers.

8.   Based on my training and experience, my conversations with other law enforcement personnel, and my own participation in this investigation, I have become familiar with the criminal activities of individuals involved in drug trafficking organizations, including drug manufacturing, drug distribution, and money laundering.  I am also aware of the tactics and methods employed by such individuals to avoid detection by law

3

enforcement, including the use of multiple wireless telephones, pre-paid cellular telephones, cloned communication devices, debit calling cards, public pay telephones, counter-surveillance techniques, false or fictitious identities, coded and ambiguous language in conversations, multiple vehicles, and vehicles with concealed compartments.

### III.  <u>STATEMENT OF PROBABLE CAUSE</u>

**A.  CHP Officers Conduct a Traffic Stop on CERVANTES Sanchez**

9.    On March 23, 2022, at approximately 4:15 p.m., California Highway Patrol ("CHP") Officer R. Valadez was driving a fully marked CHP patrol vehicle, in full CHP uniform, southbound on Arden Avenue approaching Date Street in Highland, California.  Officer Valadez saw a white Cadillac Escalade SUV, bearing California License Plate 8ZVD040 traveling northbound on Arden Avenue at a high rate of speed.  Officer Valadez visually estimated the Cadillac's speed to be approximately 60 MPH. Officer Valadez activated his front radar unit and saw that the unit gauged the Cadillac's speed to be 56 MPH in a 35 MPH zone. Officer Valadez allowed the Cadillac to pass his patrol vehicle and made a U-turn to position his patrol vehicle behind the Cadillac before activating his police lights and siren to stop the Cadillac.

10.   The Cadillac pulled over to the curb and parked on Arden Avenue, just south of Lynwood Drive.  Officer Valadez conducted a DMV check on the Cadillac, which revealed that the

registered owner of the Cadillac was Eric Sassenberg from Huntington Beach, California.

11.   Officer Valadez contacted the driver of the Cadillac, later identified as CERVANTES Sanchez, through the open passenger window of the Cadillac, and was overwhelmed by the smell of marijuana.  Officer Valadez also saw a female passenger in the front passenger seat.  Officer Valadez found it odd that the smell of marijuana was so strong considering the fact that both front windows were rolled down.  Officer Valadez informed CERVANTES Sanchez of the reason for the stop and asked for CERVANTES Sanchez's driver license, registration, and insurance card.  CERVANTES Sanchez could not provide the requested documentation, stating that his father just bought the Cadillac yesterday, March 22, 2022.  Officer Valadez asked CERVANTES Sanchez about his license, and during the interaction, could still smell the marijuana odor.

12.   CERVANTES Sanchez stated that he was not in possession of the license, but he knew his California Driver's License number.  Officer Valadez asked CERVANTES Sanchez about the marijuana odor and asked if he was in possession of any marijuana.  CERVANTES Sanchez stated that his father smokes marijuana and probably smoked in the Cadillac recently.  Officer Valadez told CERVANTES Sanchez that, due to the odor of marijuana, Officer Valadez was going to have CERVANTES Sanchez exit the Cadillac to conduct a preliminary eye exam to determine if he should follow up with a full DUI investigation.  CERVANTES Sanchez agreed and exited the Cadillac.  Officer Valadez and

CERVANTES Sanchez walked to the right front of Officer Valadez's patrol vehicle where Officer Valadez conducted an eye exam on CERVANTES Sanchez's right eye.  Officer Valadez saw that CERVANTES Sanchez's right eye did not display horizontal gaze nystagmus.  However, due to the marijuana odor, Officer Valadez also checked for lack of convergence to determine if CERVANTES Sanchez was under the influence of marijuana.  Officer Valadez saw that CERVANTES Sanchez's eyes did not display any lack of convergence.  CERVANTES Sanchez verbally identified himself by name and date of birth.  Officer Valadez conducted a driver's license check which revealed that CERVANTES Sanchez was issued a valid California Driver's License.  Officer Valadez positively identified CERVANTES Sanchez using CERVANTES Sanchez's driver's license photo.

13.   After Officer Valadez determined that CERVANTES Sanchez was not under the influence of alcohol or marijuana, Officer Valadez asked CERVANTES Sanchez about the odor of marijuana again and emphasized the strength of the smell. Officer Valadez asked if there was any marijuana in the Cadillac.  CERVANTES Sanchez said no and stated that his father smokes marijuana and it was probably from that.  Officer Valadez explained that the odor was overwhelming and fresh and that the odor could not be from smoking marijuana because the smell would be rancid and burnt.

14.   Officer Valadez asked CERVANTES Sanchez if Officer Valadez could look in the Cadillac and told CERVANTES Sanchez that it was not illegal to be in possession of a personal-use

amount.  CERVANTES Sanchez gave Officer Valadez consent by
saying "yeah" and willingly opened the Cadillac's rear hatch.
Once opened, CERVANTES Sanchez lifted the cover for a small
cargo area.  Officer Valadez saw some tire changing tools and a
cargo net.  CERVANTES Sanchez then walked to the rear left
passenger door and opened it.  Officer Valadez walked to the
rear right passenger door and asked CERVANTES Sanchez if he
could open it.  With CERVANTES Sanchez's permission, Officer
Valadez opened the door and saw a small child sleeping in the
right rear passenger seat.  Officer Valadez observed that just
below the child's feet on the right rear floorboard was a
child's backpack.

15.   Officer Valadez saw a folded cardboard box leaning
against a brown backpack in between the right rear and left rear
passenger seats. Based on Officer Valadez's training and
experience, the cardboard box appeared to be stood up against
the backpack on purpose.  Officer Valadez saw CERVANTES Sanchez
follow Officer Valadez's eyes to the backpack.  CERVANTES
Sanchez stated that the backpack was empty.  CERVANTES Sanchez
unzipped the backpack and reached inside stating the backpack
was empty.  Due to officer safety, Officer Valadez moved to a
position to take cover with his eyes still focused on the
backpack and CERVANTES Sanchez's hands.  Officer Valadez asked
CERVANTES Sanchez to remove his hand from inside the backpack.
CERVANTES Sanchez complied, lifted the backpack by its strap,
and handed it to Officer Valadez as he repeated that it was
empty.  Officer Valadez took the backpack and looked inside the

unzipped area.  Officer Valadez saw a white plastic bag wrapped around a brick shaped kilogram sized package and loose U.S. currency.  Based on Officer Valadez's training and experience, the brick shaped kilogram sized package appeared to be a large quantity of a controlled substance.  Officers did not field test the substance because of the danger posed with possible fentanyl exposure.  DEA has taken custody of the substance and sent it to a laboratory for examination with the results still pending.  I have examined photos of the substance, and I believe, based on my training and experience, that the substance is cocaine.  The substance weighed just over 1 kilogram.

16.   Officer Valadez, acting as if he did not see anything out of the ordinary, calmly handed the backpack to CERVANTES Sanchez and asked CERVANTES Sanchez to come back to the patrol vehicle so Officer Valadez could complete the citation for speeding.  Once back at the patrol vehicle, Officer Valadez distracted CERVANTES Sanchez momentarily and requested back up. As Officer Valadez waited for back up, San Bernardino County Sheriff's Deputies C. Veit and J. Desario offered Officer Valadez assistance with the stop until CHP back up arrived. Officer Valadez handcuffed CERVANTES Sanchez and placed him in the right rear of the patrol vehicle.  Officer Valadez advised CERVANTES Sanchez that he was being detained and not under arrest.  Officer Valadez re-approached the Cadillac and asked the right front passenger, Angelica Cervantes, to exit the Cadillac and detained her.  Officer Valadez, Deputy Veit, and Deputy Desario preformed a safety sweep of the SUBJECT VEHICLE

8

to make sure there were no more passengers in the vehicle.
Officer Valadez left the child sleeping in the right rear
passenger seat for the duration of the contact with Angelica
Cervantes.  After performing the safety sweep, Officer Valadez
took possession of the backpack and opened it to confirm the
contents in the presence of Deputies Veit and Desario.  Officer
Valadez unwrapped the plastic bag from around the brick-shaped,
kilogram-sized package and saw a large yellow sticker with "ZZZ"
in black lettering on it and a large orange sticker with
"Cartier" printed on it (consistent, in my training and
experience, with the kinds of labels that drug traffickers will
apply to their product).  Officer Valadez moved the plastic bag
and saw a large amount of U.S. currency in denominations of
hundreds, fifties, and twenties.

17.  Officer Valadez walked back to the patrol vehicle and
told Angelica Cervantes the reason for the detention.  Officer
Valadez informed Angelica Cervantes that she was not under
arrest but that Officer Valadez wanted to know about the
backpack and if it belonged to her.  Officer Valadez asked
Angelica Cervantes about the backpack and if she was aware of
its contents.  Angelica Cervantes stated she and CERVANTES
Sanchez use the backpack as a diaper bag for their child.
Angelica Cervantes stated that she had not seen the backpack for
about a month.  Angelica Cervantes stated that the backpack has
been in CERVANTES Sanchez's possession and that was the reason
she was now using the children's backpack as a diaper bag.
Officer Valadez asked Angelica Cervantes where they were coming

from.  Angelica Cervantes stated that she and her child were
picked up at her residence in Colton by CERVANTES Sanchez and
were on their way to CERVANTES Sanchez's house to get food.
Angelica Cervantes stated that she was not aware the backpack
was in the Cadillac.  Officer Valadez released Angelica
Cervantes from detention and allowed her and her child to leave
the scene with her family members.

18.  Officer Valadez placed CERVANTES Sanchez under arrest
at approximately 5:05 p.m. for violating California Health and
Safety Code Section 11378, possession of a controlled substance
for sales.  Officers searched the Cadillac and found SUBJECT
DEVICE 1 in the center console.  Officers searched CERVANTES
Sanchez incident to arrest and found SUBJECT DEVICE 2 in his
front pants pocket.

19.  Officer Valadez read CERVANTES Sanchez his <u>Miranda</u>
rights at approximately 5:30 p.m.  Officer Valadez asked
CERVANTES Sanchez if he understood his rights.  CERVANTES
Sanchez said "yeah."  Officer Valadez asked CERVANTES Sanchez if
he was willing to talk about the contents of the backpack.
CERVANTES Sanchez again said "yeah."  Officer Valadez asked
CERVANTES Sanchez if the backpack was his.  CERVANTES Sanchez
said yes and stated that his father asked if he could use the
bag for a trip his father took to Fresno.  CERVANTES Sanchez
stated that his father returned from the business trip a few
days earlier and must have left the bag in the Cadillac.
CERVANTES Sanchez stated that he went to his parents' house on
Val Mar Circle, Highland, California, and asked if he could use

the Cadillac to pick up Angelica Cervantes and their child to go
and eat.

20.   Officer Valadez asked about CERVANTES Sanchez's
statements that the Cadillac was purchased the day before and
that his father took a business trip in the Cadillac.  CERVANTES
Sanchez stammered a bit and stated that the Cadillac was
purchased a few days ago.  Officer Valadez asked again if the
backpack was in the Cadillac at the time CERVANTES Sanchez
picked the Cadillac up from his father and if his father left
the backpack in the Cadillac.  CERVANTES Sanchez stated he was
not sure if his father left the backpack in the Cadillac, but
whatever was inside the backpack did not belong to CERVANTES
Sanchez.

21.   At approximately 5:56 p.m., CHP Officer J. J.
Rodriguez arrived to assist Officer Valadez.  Officer Rodriguez
began speaking to CERVANTES Sanchez as he was seated in the back
of the patrol vehicle.  Officer Rodriguez asked CERVANTES
Sanchez if he was advised of his Miranda rights, and CERVANYTES
Sanchez stated that he was.  Officer Rodriguez asked CERVANTES
Sanchez if he understood his rights, and CERVANTES Sanchez
stated that he understood and was willing to talk to Officer
Rodriguez.  CERVANTES Sanchez stated that he was recently in an
accident and needed a car to drive.  CERVANTES Sanchez stated
that he went to his parents' house to pick up the Cadillac.
CERVANTES Sanchez stated that everything was already in the
Cadillac when he picked it up.  CERVANTES Sanchez stated that he
drove the Cadillac to his uncle's tire shop, located at 7615

Sterling Avenue, San Bernardino, California, to put air in the tires.  CERVANTES Sanchez stated he then drove to his "baby mama's" apartment in Grand Terrace.  CERVANTES Sanchez stated that he did not know the address to her apartment.  CERVANTES Sanchez stated he was heading back to his parents' house in Highland when he was pulled over.  CERVANTES Sanchez stated his dad recently purchased the Cadillac after a business deal.

22.   Based on the large amount of controlled substances and U.S. currency, Officer Rodriguez contacted DEA investigators to assist in the investigation.  Officer Valadez transported CERVANTES Sanchez to the CHP San Bernardino Area Office for further investigation.

23.   Once at the CHP San Bernardino Area Office, Officer Rodriguez spoke with CERVANTES Sanchez.  CERVANTES Sanchez stated that when he picked up the Cadillac, he saw the backpack containing the money and drugs but did not know what was in it. CERVANTES Sanchez stated that he purchased the backpack two years earlier, but the contents of the backpack were not his. Officer Rodriguez asked CERVANTES Sanchez who would place drugs and money in the backpack.  CERVANTES Sanchez stated, "Honestly, I don't know."  CERVANTES Sanchez stated the Cadillac was purchased a couple of day prior to the stop.  CHP Officer Rodriguez asked CERVANTES Sanchez who bought the Cadillac. CERVANTES Sanchez stated, "Pretty sure my parents."  CERVANTES Sanchez asked if he could get the backpack back because he paid $7,000 for it, but none of the contents were his.

**B.   DEA Investigators Interview CERVANTES Sanchez**

24.   Officer Valadez informed DEA TFO Callahan and me that Officer Valadez had read CERVANTEZ Sanchez his <u>Miranda</u> rights at approximately 5:30 p.m.  At approximately 8:37 p.m., TFO Callahan and I began interviewing CERVANTES Sanchez.  TFO Callahan asked CERVANTES Sanchez if he was read his <u>Miranda</u> rights and if he was still willing to answer questions. CERVANTES Sanchez told investigators that he was read his <u>Miranda</u> rights and that he was still willing to answer questions.

25.   CERVANTES Sanchez stated that he currently owns a barber shop called The Nines Barber Shop, located at 1498A N Mt. Vernon Avenue, Colton, California.  CERVANTES Sanchez stated that he has a personal cellphone and a work cellphone.  CERVANTES Sanchez was shown two iPhones seized during the traffic stop and stated that SUBJECT DEVICE 2 with the phone number 909-677-8554 is his personal phone and SUBJECT DEVICE 1 was his business phone.  CERVANTES Sanchez stated that he did not know the phone number for SUBJECT DEVICE 1.  I later called the number 909-677-8554 and CERVANTES Sanchez's uncle answered.  His uncle stated that 909-677-8554 was the house phone number.  I found an Instagram page for The Nines Barber Shop and noticed a post soliciting hiring barbers, along with CERVANTES Sanchez's phone number 909-677-8554.

26.   CERVANTES Sanchez stated that on March 23, 2022, prior to being pulled over, Angelica Cervantes's vehicle displayed a check-engine light, which made her not want to drive it.

13

CERVANTES Sanchez stated that he asked his father to borrow his 2021 Cadillac SUV.  CERVANTES Sanchez stated that Angelica Cervantes dropped CERVANTES Sanchez off at his parents' home to pick up the Cadillac.  CERVANTES Sanchez stated that his father given the Cadillac either Sunday or Monday in lieu of payment from his contracting job in construction/roofing/taxes. CERVANTES Sanchez stated that he did not know whether his father paid for the Cadillac or not.  CERVANTES Sanchez stated that his father told CERVANTES Sanchez to fill the Cadillac's tires with air.  CERVANTES Sanchez stated that it was his first time driving the Cadillac.

27.   CERVANTES Sanchez stated that he drove the Cadillac to a tire shop to get air in the tires on the way to pick up Angelica Cervantes and their two-year-old son.  CERVANTES Sanchez stated that he did not know the name of the tire shop that he stopped at, but he knew it was on Sterling Avenue in Highland, California.  I attempted to find the tire shop on a map and asked CERVANTES Sanchez where the tire shop was on Sterling Avenue.  CERVANTES Sanchez stated that the tire shop was at the corner of Sterling Avenue and E. Ninth Street.  I found Premier Tire Shop located at 7615 Sterling Avenue, Highland, California, and asked CERVANTES Sanchez if it was the tire shop where he stopped.  CERVANTES Sanchez stated that it was.  I asked CERVANTES Sanchez why he stopped at that tire shop instead of others.  CERVANTES Sanchez stated that the tire shop is owned by his uncle.

28.    CERVANTES Sanchez stated that after leaving the tire shop, he drove to Angelica Cervantes's apartment.  CERVANTES Sanchez stated that after picking up Angelica Cervantes and their son, CERVANTES Sanchez drove back to his parents' house to get something to eat.  CERVANTES Sanchez later stated that he was driving to his parents' house to trade the Cadillac SUV with his mother for a Cadillac CTS.  CERVANTES Sanchez stated that he did not want to borrow a big vehicle because gas prices were too high.

29.    CERVANTES Sanchez stated that when he was pulled over and asked about the odor of marijuana in the vehicle, CERVANTES Sanchez did not think anything of the smell.  CERVANTES Sanchez stated that he is used to the smell of marijuana from working at his barber shop.  CERVANTES Sanchez stated that everything in the vehicle was already in the Cadillac before he started driving it that day, except for a few items for his son. CERVANTES Sanchez stated that he showed the officer that there was nothing illegal in the Cadillac and that he saw the brown Louis Vuitton bag in the third row of seats behind his son. CERVANTES Sanchez stated that he grabbed the bag to show the officer there was nothing in it.  CERVANTES Sanchez stated that when he grabbed the bag, he opened it up to show the officer and handed it to Officer Valadez.  CERVANTES Sanchez stated that he saw Officer Valadez look in the bag and then handed the bag back to CERVANTES Sanchez.  CERVANTES Sanchez stated that the Louis Vuitton bag was his and that he got it for Father's Day a couple of years ago.  CERVANTES Sanchez stated that he paid

approximately $2,000, and Angelica Cervantes paid $2,000 for the bag which was approximately $4,000 in total. CERVANTES Sanchez stated that he left the Louis Vuitton bag at his parents' house when he was living with them. CERVANTES Sanchez stated that his father asked CERVANTES Sanchez if he could use CERVANTES Sanchez's bag. CERVANTES Sanchez stated that he allowed his family members to use his Louis Vuitton bag. CERVANTES Sanchez stated that the Louis Vuitton bag was his, but the bag was already in the car prior to borrowing it, and the contents of the Louis Vuitton bag were not his.

30. We asked CERVANTES Sanchez if CERVANTES Sanchez would allow investigators to look through the SUBJECT DEVICES. CERVANTES Sanchez told investigators that he has personal things on his phones and stated, "my phones are just my phones." We asked CERVANTES Sanchez to place his phones on airplane mode and handed CERVANTES Sanchez SUBJECT DEVICE 1. TFO Callahan watched CERVANTES Sanchez swiping numbers in the phone and believed that CERVANTES Sanchez was trying to delete information in the phone. TFO Callahan took SUBJECT DEVICE 1 away from CERVANTES Sanchez.

31. Later in the interview, I informed CERVANTES Sanchez that investigators were not interested in CERVANTES Sanchez's personal things on the phones, but that if investigators could see the messages between CERVANTES Sanchez and his family members, investigators could corroborate the information that CERVANTES Sanchez gave about borrowing the vehicle. CERVANTES Sanchez agreed to show investigators messages between CERVANTES Sanchez and Angelica Cervantes. I gave CERVANTES Sanchez

SUBJECT DEVICE 2, which he stated was his personal phone.
CERVANTES Sanchez did not allow investigators to read to
contents of the messages, but instead read a text message out
loud to investigators from Angelica Cervantes, in which she was
complaining about CERVANTES Sanchez not coming to pick her up.
CERVANTES Sanchez told investigators that the message was sent
at 3:30 p.m.  At the conclusion of the interview, investigators
seized the SUBJECT DEVICES.

### C. DEA Learns of Other Evidence Corroborating CERVANTES Sanchez's Drug Trafficking

32.   DEA later discovered that Officer Valadez found a
receipt from the UPS Store located at 1040 S. Mt. Vernon Avenue,
Suite G, Colton, California, in CERVANTES Sanchez's right front
pocket.  The receipt was for one 8x8x8 box and was sold on March
23, 2022, at 3:18 p.m.  Investigators also found a receipt in
the center console of the Cadillac for Lysol Spray, a three-pack
of Lysol Wipes, and two red coolers sold on March 23, 2022, at
approximately 3:14 p.m., at Walmart located at 1120 S. Mt.
Vernon Avenue, Colton, California.

33.   On March 28, 2022, DEA performed an inventory search
of the Cadillac SUV after taking custody of the vehicle.  During
the inventory search, investigators found the above-referenced
can of Lysol Spray, a three-pack of Lysol Wipes, one 8x8x8 UPS
Store box, and two red coolers, all new with original packaging
and Walmart grocery bags in the third row of seats.  Based on my
training and experience, drug traffickers who use mail services
to transport their narcotics sometimes use insulated containers

17

to thwart detection of the narcotics.  Drug traffickers also
sometimes use scented cleaning products to mask the odor of
narcotics from drug detection K-9s.  CHP had discovered these
items during their own inventory search prior to towing.

    IV. <u>**TRAINING AND EXPERIENCE REGARDING DRUG TRAFFICKING**</u>

    34.   Based on my training and experience and information
obtained from other law enforcement officers who investigate
drug trafficking, I know the following:

        c.   The distribution of drugs is a continuing
criminal activity that occurs over months, and often years.
Drug traffickers often maintain books, receipts, notes, ledgers,
bank records, and other records relating to the manufacture,
transportation, ordering, sale and distribution of illegal
drugs.  The aforementioned records are often maintained where
drug traffickers have ready access to them, such as on their
cell phones and other digital devices, including tablets, such
as iPads.

        d.   Drug traffickers use telephones, portable
cellular and digital telephones, pagers, and other communication
devices, sometimes in fictitious and/or other individuals'
names, and maintain in such devices telephone and other contact
information which reflects names, addresses, and/or telephone
numbers of their associates in the drug-trafficking
organization, as well as customers of their drug trafficking
business.

        e.   Drug traffickers often keep records of meetings
with associates, customers, and suppliers on their digital

devices, including in the form of calendar entries and location data, such as Global Positioning System ("GPS") information, other locational information, and identifying information about the trafficker and co-conspirators and the location of previous drug transactions or stash houses, and/or the identity or whereabouts of traffickers and co-conspirators involved in narcotics trafficking.

        f.   Because drug traffickers usually continue to sell drugs to support themselves until they are arrested, their communications with various co-conspirators tend to be ongoing until their arrest.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to confirm that they are in possession of the drugs, boast about the drugs, or facilitate drug sales.  It is also common for drug traffickers to carry cellular telephones in order to remain in contact with drug suppliers or customers, to communicate with co-conspirators to facilitate drug trafficking, to coordinate the movements of the trafficker and various co-conspirators, and

to coordinate the amount of drugs trafficked, as well as payment amounts and methods.  It is common for drug traffickers to accept orders and payments for drugs prior to drugs being delivered, especially in the case of drugs being shipped using the Postal Service.  Accordingly, there is often a lag between the time drugs are ordered and paid for, and the time they are received by the purchaser.  Based on my training and experience, I know that the above-described information can be stored on digital devices carried by drug traffickers.

### V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES

35.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

36.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

37.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

e.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

f.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

38.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

///

///

## VI. <u>CONCLUSION</u>

39.   For all of the reasons described above, there is probable cause that the fruits, evidence, or instrumentalities of the Subject Offenses described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this <u>12th</u> day of April, 2022.

_____
HON. SHERI PYM
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A**

SUBJECT DEVICE TO BE SEARCHED

The following digital devices seized from Andy CERVANTES Sanchez on March 23, 2022:

       a.   An Apple iPhone 7, bearing serial number 354910094644335, currently in the custody of the Drug Enforcement Administration ("DEA") and stored under evidence number N-9 ("SUBJECT DEVICE 1"); and

       b.   an Apple iPhone 11, bearing serial number 352840115802913, currently in the custody of DEA and stored under evidence number N-12 ("SUBJECT DEVICE 2").

**ATTACHMENT B**

## II.   **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 21 U.S.C. §§ 841(a)(1) (possession with intent to distribute, and distribution of, controlled substances), 843(b) (use of communication facility to commit a drug offense), and 846 (conspiracy to possess with intent to distribute, or distribute, a controlled substance) (collectively described as the "Subject Offenses"), namely:

a.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances, or drug customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

c.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all

received or missed incoming calls concerning controlled substances and/or money, assets or payments for said substances;

d.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices concerning controlled substances and/or money, assets or payments for said substances;

e.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device concerning controlled substances and/or money, assets or payments for said substances;

f.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of drugs;

g.   Contents of any calendar or date book;

h.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

i.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

j.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

        viii.    records of or information about Internet Protocol addresses used by the device;

        ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

III. <u>SEARCH PROCEDURE FOR DIGITAL DEVICE(S)</u>

2.    In searching digital devices (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

k.    Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic images thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital devices and/or forensic images thereof beyond this 120-day period without obtaining an extension of time order from the Court.

l.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

v

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

m.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

n.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

o.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

p.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

q.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

r.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

3.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

s.   Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

t.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

u.   Any magnetic, electronic, or optical storage device capable of storing digital data;

v.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

w.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

      x.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

      y.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

4.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.